# Illinois Official Reports

## Supreme Court

---

### *Coleman v. East Joliet Fire Protection District*, 2016 IL 117952

---

| | |
|---|---|
| Caption in Supreme Court: | MARCUS COLEMAN, as Successor Adm'r of the Estate of Coretta Coleman, Deceased, Appellant, v. EAST JOLIET FIRE PROTECTION DISTRICT *et al.*, Appellees. |
| Docket No. | 117952 |
| Filed | January 22, 2016 |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Will County, the Hon. Michael J. Powers, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Roman R. Okrei, of Lockport, for appellant. |
| | Stephen H. Dinolfo and Ericka J. Thomas, of Ottosen Britz Kelly Cooper Gilbert & Dinolfo, Ltd., of Naperville, for appellees East Joliet Fire Protection District, Louis Helis and Scott Mazor. |
| | Kevin J. Clancy, Martin W. McManaman and Patrick R. Moran, of Lowis & Gellen LLP, of Chicago, for appellees Will County and Laurie Zan. |

Clausen Miller P.C., of Chicago (Kimbley A. Kearney, Edward M. Kay, Paul X. Bozych and Timothy F. Jacobs, of counsel), for appellees Orland Fire Protection District and Eric Johnson.

Deidre Baumann, of Baumann & Shuldiner, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Jon Yambert and Rebecca Fozo, of Chilton Yambert Porter LLP, of Chicago, for *amicus curiae* Intergovernmental Risk Management Agency.

Scott L. Howie, of Pretzel & Stouffer Chartered, of Chicago, for *amicus curiae* Illinois Association of Defense Trial Counsel.

James S. Sinclair, of Stobbs, Sinclair & Associates, Ltd., of Alton, Michael Resis, of SmithAmundsen LLC, and James J. Roche and Lance J. Sherry, of James J. Roche & Associates, all of Chicago, for *amici curiae* Illinois Association of Fire Protection Districts *et al*.

Roger Huebner, of Springfield, James J. Powers, of Clark, Baird, Smith LLP, of Rosemont, and Todd K. Hayden and Kenneth M. Florey, of Robbins Schwartz, of Mokena, for *amici curiae* Illinois Municipal League *et al*.

Thomas G. DiCianni, of Ancel, Glink, Diamond, Bush, DiCianni & Krafthefer, P.C., of Chicago (David Lincoln Ader, of counsel), for *amici curiae* Municipal Insurance Cooperative Agency and McHenry County Municipal Risk Management Agency.

Justices

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Justice Burke concurred in the judgment and opinion.

Justice Freeman specially concurred, with opinion, joined by Justice Theis.

Justice Thomas dissented, with opinion, joined by Chief Justice Garman and Justice Karmeier.

- 2 -

**OPINION**

¶ 1  The common-law "public duty rule" provides that a local governmental entity and its employees owe no duty of care to individual members of the general public to provide governmental services such as police and fire protection services. See *Huey v. Town of Cicero*, 41 Ill. 2d 361, 363 (1968). In this appeal, we address the continued viability of the public duty rule in Illinois.

¶ 2  A wrongful death and survival action was filed on behalf of the estate of Coretta Coleman against defendants, East Joliet Fire Protection District[1] and its ambulance crew, Louis Helis and Scott Mazor; Will County[2] and its 911 operator, Laurie Zan; and the Orland Fire Protection District,[3] also known as Orland Fire District and doing business as Orland Central Dispatch, and its emergency medical dispatcher, Eric Johnson. Coleman alleged that defendants' negligent and/or willful and wanton acts and omissions deprived Coretta of a chance to survive and caused her pain and suffering.

¶ 3  The circuit court of Will County granted summary judgment in favor of all defendants, finding that the public duty rule applied and that defendants owed Coretta no special duty. The appellate court affirmed. 2014 IL App (3d) 120583-U. We allowed plaintiff's petition for leave to appeal. We now reverse and remand.

¶ 4           BACKGROUND

¶ 5  Coretta Coleman and her husband, Stanley, lived in an unincorporated area of Will County called Sugar Creek. In June 2008, all 911 calls from the Sugar Creek area were initially routed to the Laraway Public Safety Access Point, a police dispatch center operated by the Will County sheriff's office that handled only police emergencies. The East Joliet Fire Protection District provided fire and ambulance services to the Sugar Creek area and contracted with the Orland Fire Protection District for dispatching those services. All medical emergency calls from the Sugar Creek area were transferred from the Laraway Public Safety Access Point to Orland Central Dispatch, whose operators then dispatched ambulances operated by the East Joliet Fire Protection District.

¶ 6  The record indicates that on June 7, 2008, at 6:10 p.m., Coretta called 911. She was connected to the Will County 911 operator on duty, Laurie Zan. Coretta told Zan that she could not breathe and needed an ambulance. Coretta gave her address as "1600 Sugar Creek Drive" in Joliet, and told Zan to "hurry." Zan told Coretta to hold and then transferred the call to Orland Central Dispatch. Eric Johnson, an emergency medical dispatcher for Orland Central Dispatch, received Coretta's transferred 911 call from Zan. Although the written procedures required Zan to communicate the nature of Coretta's emergency call, Zan hung up as soon as the call was transferred and did not speak to Johnson. Johnson asked Coretta some questions

---

[1]East Joliet Fire Protection District is a municipal corporation authorized and organized under the Fire Protection District Act (70 ILCS 705/1 *et seq*. (West 2006)).

[2]Will County is a "body politic and corporate." See (55 ILCS 5/5-1001 (West 2006)) (Counties Code).

[3]Orland Fire Protection District is a municipal corporation authorized and organized under the Fire Protection District Act (70 ILCS 705/1 *et seq*. (West 2006)).

but received no response. Johnson did not know whether anyone was on the line or whether the call was dropped. Johnson hung up and called Coretta's number twice but received a busy signal. Johnson testified that dispatchers are trained to call the agency that transferred the 911 call if more information is needed, but he did not. Johnson identified the nature of the call as an "unknown medical emergency" and placed the call in line for an ambulance dispatch at 6:13 p.m.

¶ 7    At 6:16 p.m., East Joliet Fire Protection District ambulance 524, crewed by Louis Helis and Scott Mazor, was dispatched to the Coleman residence. Helis and Mazor were given Coretta's address and told that the 911 call involved an "unknown emergency." Helis and Mazor arrived at the Coleman residence at 6:19 p.m. They were unable to enter the home because the doors were locked. They rang the doorbell, pounded on the doors, and yelled "Fire Department!" but no one answered. They looked in the windows of the home but did not see anyone. Helis and Mazor radioed Orland Central Dispatch for more information and asked the dispatcher, Jacqueline Johnson, to call Coretta. Jacqueline Johnson told Helis and Mazor that "we'll try in a minute." Jacqueline Johnson recalled that when she attempted to contact Will County for more information, the line was busy.

¶ 8    While at the Coleman home, Helis and Mazor were approached by two neighbors who informed them that an elderly couple lived at the residence. The man had heart issues, and they had seen him mow the lawn earlier that day, but his truck was gone. The neighbors did not have the Colemans' phone number but said the woman was unlikely to answer the phone. Based on this information, Helis and Mazor determined that a forced entry could not be made. Helis and Mazor told the neighbors that they could not make a forced entry without a police officer present. However, they advised that the neighbors could call the police and ask them to perform a forced entry.

¶ 9    Helis and Mazor called their supervisor at the East Joliet Fire Protection District, who ordered them to leave the scene and go back into service. Helis and Mazor then called Orland Central Dispatch and told them to "be advised" there was "no patient." Helis and Mazor left the Coleman residence at 6:24 p.m.

¶ 10    After ambulance 524 left the Coleman residence, one of the neighbors who spoke with Helis and Mazor called 911 and spoke with Zan. She told Zan the paramedics were at the Coleman residence but left when no one answered the door. The neighbor asked for police to be dispatched. Shortly thereafter, another neighbor called 911 and told Zan there was an emergency at "1600 Sugar Creek Drive." At 6:37 p.m., Zan called Orland Central Dispatch and told Eric Johnson that she had transferred a call to him earlier from a "female [who] was unable to breathe" and that "all the neighbors are calling saying that the fire department left and did nothing." Johnson told Zan that "they were already there." Zan responded, "[a]ll right. Well, apparently they couldn't get in the house, and they cleared from the call. We don't know if the lady is alive or dead." Johnson attempted to dispatch a second ambulance to the Coleman residence.

¶ 11    During her conversation with Eric Johnson, Zan did not give him Coleman's complete address. She said "1600 Sugar Creek," but the Colemans' subdivision contains both a "Sugar Creek Court" and a "Sugar Creek Drive." At 6:40 p.m., Johnson erroneously dispatched East Joliet Fire Protection District ambulance 534 to "1600 Sugar Creek Court," instead of "1600 Sugar Creek Drive." The ambulance crew called Orland Central Dispatch to check the address

when there appeared to be no number 1600 on Sugar Creek Court. Eric Johnson called Will County 911 for more information about the address. While Johnson spoke with a Will County dispatcher, the crew of ambulance 534 found the Coleman residence on their own. The ambulance arrived at the house at 6:51 p.m., 41 minutes after Coretta made the initial 911 call. The crew knocked on the door, but no one answered. They then called a supervisor to ask if they should force entry. Coretta's husband then arrived and let them into the house. The crew found Coretta unresponsive, and she was pronounced dead at the hospital. Coretta died of cardiac arrest brought on by a rapid onset of pulmonary edema. Coretta was 58 years old at the time of her death.

¶ 12    Coretta's surviving husband, Stanley, as administrator of Coretta's estate, filed claims for wrongful death and survival on behalf of the estate in the circuit court of Cook County. The case was subsequently transferred to Will County. Stanley died during the pendency of the proceedings, and the Colemans' son, Marcus Coleman, the successor administrator of Coretta's estate, was substituted as plaintiff in this case.

¶ 13    Counts I through XIV of plaintiff's complaint alleged willful and wanton conduct against all defendants. Counts XV through XXVIII alleged negligence "instead of willful and wanton conduct with the assumption, that may be wrong, that under the current state of the law, a negligence claim will not permit recovery due to immunity." Plaintiff's complaint indicated the negligence allegations were made "to preserve the record in the event the law changes so that the government is held to the same standards that the citizens are, or in the event that the Plaintiff's understanding of the law is wrong."

¶ 14    Defendants East Joliet Fire Protection District, Louis Helis and Scott Mazor, as well as Orland Fire Protection District and Eric Johnson, filed motions to dismiss plaintiff's complaint arguing, *inter alia*, that they were immune from civil liability pursuant to section 3.150 of the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/3.150 (West 2006)). Defendants Will County and Laurie Zan filed a motion to dismiss plaintiff's complaint arguing, *inter alia*, that they were immune from civil liability pursuant to section 15.1 of the Emergency Telephone System Act (50 ILCS 750/15.1 (West 2006)). In response to defendants' motions to dismiss, plaintiff agreed that the negligence counts should be dismissed due to immunity but argued that the counts alleging willful and wanton conduct should not be dismissed because both the Emergency Medical Services (EMS) Systems Act and the Emergency Telephone System Act provide liability for willful and wanton conduct. The trial court granted the motions to dismiss in part, dismissing plaintiff's negligence counts, but denied defendants' motions to dismiss plaintiff's counts alleging willful and wanton conduct.

¶ 15    Defendants filed motions for summary judgment on plaintiff's remaining willful and wanton counts, arguing that: (1) they owed no duty to Coretta under the public duty rule and (2) even if they did owe Coretta a duty, they were immune from liability under section 3.150 of the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/3.150 (West 2006)) and/or section 15.1 of the Emergency Telephone System Act (50 ILCS 750/15.1 (West 2006)), because their conduct was not willful and wanton. Defendants East Joliet Fire Protection District and its employees, Helis and Mazor, as well as Will County, and its employee, Zan, also asserted absolute immunity under various sections of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2006)). The trial court granted summary judgment in favor of all defendants on the willful and wanton

counts under the public duty rule. The trial court held that the "special duty" exception to the public duty rule did not apply to any of the defendants because Coretta "initiated the contact with the municipality and was not under the direct or immediate control of any of the defendants." The trial court did not reach the issue of immunity. The appellate court affirmed. 2014 IL App (3d) 120583-U.

¶ 16      We allowed plaintiff's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Jan. 1, 2015)). We allowed *amicus curiae* briefs to be filed by: (1) the Illinois Trial Lawyers Association; (2) the Intergovernmental Risk Management Agency; (3) the Illinois Association of Defense Trial Counsel; (4) the Illinois Municipal League, the Illinois Public Employer Labor Relations Association and the Illinois Community College Trustees Association; (5) the Illinois Association of Fire Protection Districts, the Northern Illinois Alliance of Fire Protection Districts and the Illinois Fire Chiefs Association; and (6) the Municipal Insurance Cooperative Agency and the McHenry County Municipal Risk Management Agency. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 17                                    ANALYSIS

¶ 18      Initially, we address the motion of Orland Fire Protection District and Eric Johnson to strike certain parts of plaintiff's separate appendix as well as references to those sections contained in plaintiff's brief, arguing that those sections are outside the appellate record. Plaintiff filed an objection to the motion to strike, pointing out that the material at issue, with the exception of two sentences, are printouts of deposition statements contained on a computer disk that is part of the record. Plaintiff asserts that he provided the hard copies for this court's convenience and that one of the two sentences not included on the disk was testified to by another witness, while the other sentence is not implicated in the controversy before this court. Alternatively, plaintiff argues that the court can simply ignore the two sentences without striking anything from the record or the briefs. We ordered the motion taken with the case.

¶ 19      "This court has recognized that striking a portion of an appellate brief ' "is a harsh sanction," ' appropriate only if a violation of our procedural rules interferes with or precludes our review." *People v. Howard*, 233 Ill. 2d 213, 224 (2009) (quoting *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005), quoting *Moomaw v. Mentor H/S, Inc.*, 313 Ill. App. 3d 1031, 1035 (2000)). Given plaintiff's clarification of the material and statements at issue, we find that these matters do not hinder or preclude our review of the case, and we therefore deny the motion to strike.

¶ 20      We begin our analysis by addressing the standard of review. Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with affidavits, if any, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2010); *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106 (2007). We review the trial court's decision on a motion for summary judgment *de novo*. *Pielet v. Pielet*, 2012 IL 112064, ¶ 30.

¶ 21      The primary issue we are asked to address in this appeal is whether the public duty rule remains viable. The continued viability of the public duty rule is a question of law subject to *de novo* review. *Vancura v. Katris*, 238 Ill. 2d 352, 373-74 (2010).

¶ 22    The continued viability of the public duty rule depends on the interplay between the public duty rule and governmental tort immunity. Therefore, before addressing the continued viability of the public duty rule in Illinois and, ultimately, whether the trial court properly granted summary judgment in favor of defendants, we examine the origins and history of various forms of governmental tort immunity in Illinois. We begin by reviewing state governmental immunity.

¶ 23                            State Governmental Immunity

¶ 24    The immunity of the State of Illinois and its agencies from suit of any kind, unless the State consents to be sued, is rooted in the English common-law doctrine of sovereign immunity. *S.J. Groves & Sons Co. v. State*, 93 Ill. 2d 397, 400 (1982). Under the English common law, sovereign immunity was based on the political theory that the King could do no wrong and that "the Crown is immune from any suit to which it has not consented." *Feres v. United States*, 340 U.S. 135, 139 (1950).

¶ 25    The first Illinois Constitution, adopted in 1818, as part of the process of Illinois being admitted to the Union, contained no provision for sovereign immunity. See Ill. Const. 1818. In 1819, shortly after being admitted to statehood, the State of Illinois adopted the common law of England. See 1833 Ill. Laws 425; see also *S.J. Groves & Sons*, 93 Ill. 2d at 400. The Illinois Constitution of 1848 contained the first constitutional provision addressing sovereign immunity and provided that "The general assembly shall direct by law in what manner suits may be brought against the state." Ill. Const. 1848, art. III, § 34. In 1870, sovereign immunity officially became a constitutional doctrine in Illinois. Article IV, section 26, of the Illinois Constitution of 1870 provided: "[t]he state of Illinois shall never be made defendant in any court of law or equity." Ill. Const. 1870, art. IV, § 26. The constitutional doctrine of sovereign immunity applied to lawsuits of any kind against the State of Illinois and its agencies unless the State consented to be sued. See *Monroe v. Collins*, 393 Ill. 553, 557 (1946). Consequently, no suit could be maintained against the State.

¶ 26    In 1877, a Commission of Claims was created to hear claims against the State (1877 Ill. Laws 64). In 1903, the Court of Claims Act repealed the Act of 1877 and gave the Court of Claims exclusive jurisdiction to rule on claims against the State. 1903 Ill. Laws 140. The Court of Claims Act of 1917 repealed the Act of 1903, but the Court of Claims retained exclusive jurisdiction to hear claims against the State. 1917 Ill. Laws 325. In 1945, a new Court of Claims Act was passed allowing for limited recovery against the State of Illinois for the torts of its agents and was subsequently amended in 1951 (Ill. Rev. Stat. 1951, ch. 37, ¶ 439.8), with the Court of Claims continuing to retain exclusive jurisdiction for claims against the State. Henry Novoselsky & John Peterson, *State Immunity in Illinois: The Court of Claims*, 15 DePaul L. Rev. 340 (1965).

¶ 27    In 1970, the Committee on General Government to the Illinois Constitutional Convention of 1970 determined that the public interest would best be served by eliminating the doctrine of sovereign immunity from the new constitution. See 6 Record of Proceedings, Sixth Illinois Constitutional Convention 573 (hereinafter Proceedings). One of the proposals was worded: "[e]xcept as the General Assembly may otherwise provide, the sovereign immunity of the State of Illinois and all other units of government is abolished." 6 Proceedings 678. The provision that was ratified, however, does not expressly include lower units of government,

and provides: "[e]xcept as the General Assembly may provide by law, sovereign immunity in this State is abolished." Ill. Const. 1970, art. XIII, § 4.[4]

¶ 28    In 1972, the General Assembly, pursuant to its constitutional authority, passed the State Lawsuit Immunity Act. See Pub. Act 77-1776, § 1 (eff. Jan. 1, 1972); 745 ILCS 5/0.01 *et seq.* (West 2014). Section 1 of the State Lawsuit Immunity Act provides that, except as provided in the Court of Claims Act (705 ILCS 505/1 *et seq.* (West 2014)) and other specified statutes, "the State of Illinois shall not be made a defendant or party in any court" (745 ILCS 5/1 (West 2014)). The Court of Claims Act, in turn, provides that the Court of Claims possesses exclusive jurisdiction to hear and determine various matters, including "[a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit" and, with certain exceptions, limits a claimant's damages. 705 ILCS 505/8(d) (West 2014). Accordingly, state sovereign immunity has been abolished and replaced by the State Lawsuit Immunity Act (745 ILCS 5/0.01 *et seq.* (West 2014)). We now examine the origins and history of local governmental tort immunity in Illinois.

¶ 29                          Local Governmental Tort Immunity

¶ 30    Local governmental tort immunity in Illinois was first recognized in 1844, in *Hedges v. County of Madison*, 6 Ill. 567 (1844), adopting the immunity doctrine of *Russell v. Men Dwelling in the County of Devon*, 2 Term Rep. 671, 100 Eng. Rep. 359 (1788). *Russell* involved a tort action against an unincorporated county where the action was disallowed because the county was unincorporated and had no fund to pay a judgment.

¶ 31    In *Hedges*, this court held that a county was immune from liability for its failure to maintain a bridge in safe condition. The rationale was that protecting counties from liability preserved public funds for public purposes. *Hedges*, 6 Ill. at 571. Common-law local governmental tort immunity was eventually extended to townships (*Town of Waltham v. Kemper*, 55 Ill. 346 (1870)), drainage districts (*Elmore v. Drainage Commissioners*, 135 Ill. 269 (1890)), and school districts (*Kinnare v. City of Chicago*, 171 Ill. 332 (1898), *overruled in part by Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959)). These units of local government were considered quasi-corporations and "local subdivisions of the State, established by the sovereign power of the State, clothed with but few corporate powers." *Hollenbeck v. County of Winnebago*, 95 Ill. 148, 162-63 (1880). Accordingly, no tort action could be maintained against units of local government that were established by the State.

¶ 32    Municipalities (cities, villages, and incorporated towns), on the other hand, were held liable under the common law for torts committed in a proprietary capacity rather than a traditional governmental activity. See, *e.g.*, *Roumbos v. City of Chicago*, 332 Ill. 70, 74 (1928). In *Culver v. City of Streator*, 130 Ill. 238 (1889), this court observed:

---

[4]As explained below, however, this court had previously abolished the immunity of units of local government in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959). This court has recognized that the 1970 constitutional provision abolishing sovereign immunity " 'embodies the presumptive rule from *Molitor* that units of local government are subject to tort liability,' and provides that the General Assembly possessed the exclusive power to determine whether such a governmental unit is statutorily immune from liability." *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 44 (1998) (quoting *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 344-45 (1998)).

"in those [governmental] matters the city acts only as the agent of the State, in the discharge of duties imposed by law for the promotion and preservation of the public and general welfare, as contradistinguished from mere corporate acts, having relation to the management of its corporate or private concerns, and from which it derives some special or immediate advantage or emolument in its corporate or private character." *Culver*, 130 Ill. at 244-45.

¶ 33    Thus, local governmental tort immunity varied, depending on whether the claim was made against a local governmental subdivision of the State or against a municipality. The common-law doctrine of local governmental tort immunity changed in 1959, with this court's decision in *Molitor*, 18 Ill. 2d 11. In *Molitor*, this court abolished governmental tort immunity of school districts for the negligence of their employees. *Molitor* effectively abolished governmental tort immunity for all units of local government. See *List v. O'Connor*, 19 Ill. 2d 337, 340 (1960); *Walker v. Forest Preserve District*, 27 Ill. 2d 538 (1963).

¶ 34    In 1965, in response to this court's decision in *Molitor*, the legislature enacted the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2014)). The Tort Immunity Act provides that its purpose "is to protect local public entities and public employees from liability arising from the operation of government. It grants only immunities and defenses." 745 ILCS 10/1-101.1 (West 2014). The Tort Immunity Act applies to "[l]ocal public entit[ies]," including counties, fire protection districts, and other local governmental bodies. 745 ILCS 10/1-206 (West 2014). "The Tort Immunity Act adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 192 (1997).

¶ 35    Relevant to this appeal, the General Assembly has also enacted other legislation that provides immunity for various emergency services such as the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/3.150 (West 2006)) and the Emergency Telephone System Act (50 ILCS 750/15.1 (West 2006)). Thus, in Illinois, the common-law doctrine of local governmental tort immunity has been replaced by the Tort Immunity Act and other statutes that grant tort immunity for various governmental services provided to the public. With this understanding of the history and development of state immunity and local governmental tort immunity, we now examine the origin and history of the public duty rule.

¶ 36                                   Public Duty Rule

¶ 37    The common-law "public duty rule" provides that local governmental entities owe no duty to individual members of the general public to provide adequate government services, such as police and fire protection. See *Burdinie v. Village of Glendale Heights*, 139 Ill. 2d 501, 509 (1990), *overruled on other grounds in McCuen v. Peoria Park District*, 163 Ill. 2d 125 (1994); *Huey*, 41 Ill. 2d at 363. In *Leone v. City of Chicago*, 156 Ill. 2d 33 (1993), this court stated:

"The courts of this State have held as a matter of common law that municipalities are generally not liable for failure to supply police or fire protection [citation], nor are they liable for injuries negligently caused by police officers or fire fighters while performing their official duties [citation]. An exception to these rules has been recognized where the municipality owes the injured party a special duty that is different from its duty to the general public." *Leone*, 156 Ill. 2d at 37.

- 9 -

¶ 38    The long-standing public duty rule "is grounded in the principle that the duty of the governmental entity to 'preserve the well-being of the community is owed to the public at large rather than to specific members of the community.' " *Zimmerman*, 183 Ill. 2d at 32 (quoting *Schaffrath v. Village of Buffalo Grove*, 160 Ill. App. 3d 999, 1003 (1987)).

¶ 39    The public duty rule is believed to have originated in the United States Supreme Court case of *South v. Maryland*, 59 U.S. 396 (1855). See David S. Bowers, *Tort Law—The Public Duty Doctrine: Should It Apply in the Face of Legislative Abrogation of Sovereign Immunity?—Coleman v. Cooper*, 12 Campbell L. Rev. 503, 506 (1990); John Cameron McMillan, Jr., Note, *Government Liability and the Public Duty Doctrine*, 32 Vill. L. Rev. 505, 509 (1987). In *South*, the plaintiff sued the sheriff for refusing to enforce the laws of the state and for failing to protect the plaintiff after he was kidnapped and forced to pay a ransom to be released. The Supreme Court found that the sheriff's duty to keep the peace was a "public duty, for neglect of which he is amenable to the public, and punishable by indictment only." *South*, 59 U.S. at 403. The Supreme Court, citing the common law of England, indicated this had been the law for centuries. *South*, 59 U.S. at 403.

¶ 40    Some courts, however, cite to Thomas M. Cooley's 1880 treatise on tort law as the origin of the public duty rule. Jayme S. Walker, *Insulating Negligent Police Behavior in Indiana: Why the Victims of a Drunk Driver Negligently Released by a Police Officer Have No Remedy*, 23 Val. U. L. Rev. 665, 674 n.60 (1989) (citing as examples of courts citing to Cooley's treatise as the origin of the public duty rule: *Trautman v. City of Stamford*, 350 A.2d 782, 784 (Conn. Super. Ct. 1975); *Leger v. Kelley*, 110 A.2d 635, 638 (Conn. Super. Ct. 1954); *Sawicki v. Village of Ottawa Hills*, 525 N.E.2d 468 (Ohio 1988); *DeWald v. State*, 719 P.2d 643, 652-53 (Wyo. 1986)). Cooley's treatise states:

> "The rule of official responsibility, then, appears to be this: that if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages." Jayme S. Walker, *Insulating Negligent Police Behavior in Indiana: Why the Victims of a Drunk Driver Negligently Released by a Police Officer Have No Remedy*, 23 Val. U. L. Rev. 665, 674 n.60 (1989) (quoting Thomas M. Cooley, A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract 379 (1880)).

¶ 41    The public duty doctrine was widely accepted in most jurisdictions. See *Ezell v. Cockrell*, 902 S.W.2d 394, 397 n.2 (Tenn. 1995) (citing *Leake v. Cain*, 720 P.2d 152, 155 n.6 (Colo. 1986) (*en banc*) (quoting Thomas M. Cooley, A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contracts 379 (1880)), and Kelly Mahon Tullier, Note, *Governmental Liability for Negligent Failure to Detain Drunk Drivers*, 77 Cornell L. Rev. 873, 887 (1992)). Over time, however, courts developed exceptions to the public duty doctrine. For example, the "special duty exception" to the public duty rule is applicable only in limited cases when the local governmental entity owes a special duty of care to a particular individual that is different from the duty it owes to the general public. *Burdinie*, 139 Ill. 2d at 508-09.

¶ 42    While the public duty rule is a long-standing common-law rule, we have found very few Illinois cases applying the doctrine prior to the abolition of local governmental immunity by

this court in *Molitor* in 1959. The first decision of this court acknowledging the public duty rule and the special duty exception was in the 1968 decision of *Huey*, 41 Ill. 2d 361. The absence of cases applying the public duty rule and the special duty exception prior to the abolition of local governmental immunity is not surprising. Until local governmental immunity was abolished in *Molitor*, the public duty rule and the special duty exception remained in abeyance. In other words, local governmental immunity stood as an absolute bar to the enforcement of any civil liability arising from a breach of any duty. As one court aptly noted:

> "While governmental immunity remained in effect, this type of court action remained in abeyance. It remained in abeyance not on account of absence of duty on the part of a municipality to the injured or deceased person, but for the reason that where the factual basis of the claim was involved in the performance of a governmental function (such as police duty), the State had not permitted itself or its political subdivisions or municipal corporations to be sued. Where the immunity was removed, this bar no longer stood against the enforcement of civil liability arising from breach of a duty that existed before, but which could not be enforced until the immunity was waived." *Schuster v. City of New York*, 154 N.E.2d 534, 539 (N.Y. 1958).

Thus, where governmental immunity applied as an absolute defense of liability, the public duty rule and the special duty exception remained in abeyance. We now address the plaintiff's argument that the public duty rule should be abolished in Illinois.

¶ 43                              Continued Viability of Public Duty Rule

¶ 44    Plaintiff argues that the public duty rule is the equivalent of sovereign immunity and that the public duty rule should be abolished by this court in light of the abrogation of sovereign immunity and passage of statutory tort immunities. In *Huey*, this court stated that the public duty rule existed "[i]ndependent[ly] of statutory or common-law concepts of sovereign immunity." *Huey*, 41 Ill. 2d at 363.

¶ 45    The public duty rule is not the equivalent of any type of sovereign immunity. While the public duty rule and sovereign immunity are both common-law concepts, the "public duty rule" developed separately and exists independently of any constitutional, statutory or common-law concepts of "sovereign immunity." As explained earlier in this opinion, state government immunity was grounded in the English common-law doctrine of sovereign immunity, became a state constitutional doctrine in 1870 (Ill. Const. 1870, art. IV, § 26), was constitutionally abolished in 1970 (Ill. Const. 1970, art. XIII, § 4), and was legislatively replaced by the State Lawsuit Immunity Act (745 ILCS 5/1 (West 2014)). *Supra* ¶¶ 26-28. Local governmental tort immunity of a county was first recognized in *Hedges*, 6 Ill. 567, adopting the immunity doctrine of *Russell*, 2 Term Rep. 671, 100 Eng. Rep. 359, and was eventually extended to other local governmental subdivisions of the State. This court abolished governmental tort immunity for all units of local government in *Molitor*, 18 Ill. 2d 11, and local governmental tort immunity was then replaced by statutory tort immunity. *Supra* ¶¶ 30-34. The public duty rule is not rooted in sovereign immunity nor did the public duty rule develop from any concepts of government immunity from suit. Rather, the public duty rule developed independently and separately from concepts of governmental immunity (see *supra* ¶¶ 37-39) and "is grounded in the principle that the duty of the governmental entity to

'preserve the well-being of the community is owed to the public at large rather than to specific members of the community.' " *Zimmerman*, 183 Ill. 2d at 32 (quoting *Schaffrath*, 160 Ill. App. 3d at 1003).

¶ 46 The issue of whether a duty is owed is a separate and distinct issue from whether a defense of governmental immunity applies. This court has consistently held that the issue of a duty is separate from the issue of immunity from liability based on that duty. See *Barnett v. Zion Park District*, 171 Ill. 2d 378, 388 (1996) ("[i]t is important to recognize that the existence of a duty and the existence of an immunity are separate issues"); *Zimmerman*, 183 Ill. 2d at 46 (same); *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001) (same); *Arteman v. Clinton Community Unit School District No. 15*, 198 Ill. 2d 475, 479-80 (2002) (same); *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 507 (2006). In *Zimmerman*, this court explained the distinction between the concepts of duty and statutory immunities after ratification of the 1970 Constitution:

> " 'The judicial abrogation of sovereign immunity merely abrogated a defense to any preexisting duty. [Citation.] \*\*\* Neither *Molitor*, nor any waiver of immunity creates new tort duties and liabilities. [Citations.] Under the inapplicable concept of sovereign immunity, despite any "apparent duty," the governmental entity is immune from tort liability. This does not occur from a denial of the tort's existence, but rather because the existing liability in tort is disallowed. In contrast, [under the rationale of the public duty rule] the tort liability or duty never existed. [Citations.]' " *Zimmerman*, 183 Ill. 2d at 46 (quoting *Martin v. Lion Uniform Co.*, 180 Ill. App. 3d 955, 961-62 (1989)).

*Zimmerman* specifically noted that "[t]he distinction between an immunity and a duty is crucial, because only if a duty is found is the issue of whether an immunity or defense is available to the governmental entity considered." *Zimmerman*, 183 Ill. 2d at 46. Because of this distinction between duties and immunities, "neither this court's decision in *Molitor* abolishing sovereign immunity, the General Assembly's passage of the Tort Immunity Act, nor the ratification of the 1970 Illinois Constitution altered the common-law public duty rule that a governmental entity generally owes no duty to provide an individual citizen with specific municipal services." *Zimmerman*, 183 Ill. 2d at 45.

¶ 47 Plaintiff also argues, alternatively, that *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, should be read to nullify the public duty rule implicitly because this court founded its decision on the principle that " 'every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act.' " (Internal quotation marks omitted.) *Doe-3*, 2012 IL 112479, ¶ 21 (quoting *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 19). However, we did not examine the continued viability of the public duty rule in *Doe-3*. Rather, the public duty rule was "of no moment" in that case because it was not implicated by the allegations in the plaintiffs' complaint. *Doe-3*, 2012 IL 112479, ¶ 40. In fact, we emphasized that our holding in *Doe-3* was limited to the particular circumstances presented in that case. *Doe-3*, 2012 IL 112479, ¶ 45. Accordingly, *Doe-3* did not abrogate the public duty rule or otherwise announce its demise.

¶ 48 Plaintiff also suggests that the decisions of this court in *DeSmet*, 219 Ill. 2d at 508-09, and *Aikens v. Morris*, 145 Ill. 2d 273, 278 n.1 (1991), imply that the public duty rule may no longer have sustained viability. This court has already explicitly and repeatedly ruled that neither the

abolition of sovereign immunity nor the legislature's passage of statutory immunity "altered the common law public duty rule that a governmental entity generally owes no duty to provide an individual citizen with specific municipal services." *Zimmerman*, 183 Ill. 2d at 45; *Huey*, 41 Ill. 2d at 363. Moreover, the continued viability of the public duty rule was not addressed in *DeSmet*, or *Aikens* and, therefore, those cases provide no support for abandoning the public duty rule.

¶ 49 A majority of jurisdictions continue to adhere to the public duty rule despite abolition of sovereign immunity and passage of immunity statutes, "concluding that, in both law and policy, the rule is sound and necessary." *Ezell*, 902 S.W.2d at 399. A few jurisdictions have, however, abrogated or narrowed the application of the public duty rule. See *Adams v. State*, 555 P.2d 235 (Alaska 1976) (superseded by statute); *Ryan v. State*, 656 P.2d 597 (Ariz. 1982) (*en banc*) (superseded by statute); *Leake v. Cain*, 720 P.2d 152 (Colo. 1986) (*en banc*) (superseded by statute); *Commercial Carrier Corp. v. Indian River County*, 371 So. 2d 1010 (Fla. 1979); *Jean W. v. Commonwealth*, 610 N.E.2d 305 (Mass. 1993) (abrogated by statute); *Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. 2008); *Wilson v. Nepstad*, 282 N.W.2d 664 (Iowa 1979); *Maple v. City of Omaha*, 384 N.W.2d 254 (Neb. 1986); *Shear v. Board of County Commissioners*, 1984-NMSC-079, 101 N.M. 671, 687 P.2d 728; *Stewart v. Schmieder*, 386 So. 2d 1351 (La. 1980) (superseded by statute); *Brennen v. City of Eugene*, 591 P.2d 719 (Or. 1979); *Coffey v. City of Milwaukee*, 247 N.W.2d 132 (Wis. 1976); *Hopkins v. State*, 702 P.2d 311 (Kan. 1985).

¶ 50 Some of those jurisdictions have revived the public duty rule via legislation after state courts abolished it. We note that the legislatures of Alaska, Arizona, Colorado, Massachusetts, and Louisiana have passed legislation reinstating the public duty rule. The Florida Supreme Court subsequently retreated from its earlier decision abrogating the public duty rule and limited its holding in *Commercial Carrier*. See *Trianon Park Condominium Ass'n v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985). The Iowa Supreme Court has clarified that it did not abolish the public duty doctrine, but its application has been narrowed. See *Kolbe v. State*, 625 N.W.2d 721, 729 (Iowa 2001) ("we have not expressly abolished the public duty doctrine, although we have narrowed its application"); *Raas v. State*, 729 N.W.2d 444, 449 (Iowa 2007) ("In *Kolbe* we recognized that the public-duty doctrine is still viable despite enactment of the State Tort Claims Act ***. *** [The public-duty doctrine is] alive and well in Iowa."). Our research has found that, currently, six jurisdictions do not follow the public duty rule either by common law or statutorily: Missouri, Nebraska, New Mexico, Oregon, Wisconsin, and Kansas.

¶ 51 The primary rationale employed by the courts that abolished the public duty rule was that the doctrine was nothing more than a continuation of sovereign immunity and should not exist when sovereign immunity had been abolished. We have already rejected this argument. See *Zimmerman*, 183 Ill. 2d at 45; *Huey*, 41 Ill. 2d at 363. We reiterate: the public duty rule is not a form of sovereign immunity. Rather, this court has been clear that " 'the existence of a duty and the existence of an immunity are separate issues.' " *Zimmerman*, 183 Ill. 2d at 45 (quoting *Barnett*, 171 Ill. 2d at 388).

¶ 52 We have consistently held that the public duty rule survived the abolition of sovereign immunity and passage of the Tort Immunity Act. See *Zimmerman*, 183 Ill. 2d at 45; *Huey*, 41

Ill. 2d at 363. Nevertheless, after much reflection, we have determined that the time has come to abandon the public duty rule and its special duty exception.

¶ 53   "Overruling a decision of this court, let alone an entire body of case law, necessarily implicates *stare decisis* principles." *People v. Sharpe*, 216 Ill. 2d 481, 519 (2005). As this court recognized in *Sharpe*:

> " 'The doctrine of *stare decisis* "expresses the policy of the courts to stand by precedents and not to disturb settled points." *Neff v. George*, 364 Ill. 306, 308-09 (1939), overruled on other grounds by *Tuthill v. Rendelman*, 387 Ill. 321 (1944). This doctrine "is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994). *Stare decisis* enables both the people and the bar of this state "to rely upon [this court's] decisions with assurance that they will not be lightly overruled." *Moehle v. Chrysler Motors Corp.*, 93 Ill. 2d 299, 304 (1982).
>
> To be sure, *stare decisis* is not an inexorable command. *Chicago Bar Ass'n*, 161 Ill. 2d at 510; *Payne v. Tennessee*, 501 U.S. 808, 842, 115 L. Ed. 2d 720, 746, 111 S. Ct. 2597, 2617 (1991) (Souter, J., concurring). However, we have consistently held that any departure from *stare decisis* must be specially justified (*Chicago Bar Ass'n*, 161 Ill. 2d at 510) and that prior decisions should not be overruled absent "good cause" (*Moehle*, 93 Ill. 2d at 304; *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152, 166-67 (1955)) or "compelling reasons" (*Moehle*, 93 Ill. 2d at 304; *People v. Robinson*, 187 Ill. 2d 461, 463-64 (1999)). This court also has recognized that "it will not depart from precedent 'merely because the court is of the opinion that it might decide otherwise were the question a new one.' " *Robinson*, 187 Ill. 2d at 463-64, quoting *Maki v. Frelk*, 40 Ill. 2d 193, 196-97 (1968) In sum, "when a rule of law has once been settled, contravening no statute or constitutional principle, such rule ought to be followed unless it can be shown that serious detriment is thereby likely to arise prejudicial to public interests." *Maki*, 40 Ill. 2d at 196; see also *Heidenreich v. Bremner*, 260 Ill. 439, 450-51 (1913).' " *Sharpe*, 216 Ill. 2d at 519-20 (quoting *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81-82 (2004)).

In *Sharpe*, this court "further noted that good cause to depart from *stare decisis* exists when governing decisions are unworkable or are badly reasoned." *Sharpe*, 216 Ill. 2d at 520.

¶ 54   We believe that departing from *stare decisis* and abandoning the public duty rule and its special duty exception is justified for three reasons: (1) the jurisprudence has been muddled and inconsistent in the recognition and application of the public duty rule and its special duty exception; (2) application of the public duty rule is incompatible with the legislature's grant of limited immunity in cases of willful and wanton misconduct; and (3) determination of public policy is primarily a legislative function and the legislature's enactment of statutory immunities has rendered the public duty rule obsolete.

¶ 55   First, application of the public duty rule and its special duty exception has become muddled and inconsistent. Whether a plaintiff can establish that a local public entity owed a duty is a separate and distinct inquiry from the issue of whether defendants can claim a statutory immunity is available as a defense. Therefore, "[o]nce a court determines that a duty exists, it then addresses whether [statutory immunity] applies." *Harris v. Thompson*, 2012 IL 112525,

¶ 17 (citing *Arteman*, 198 Ill. 2d at 480, and *Village of Bloomingdale*, 196 Ill. 2d at 490). As one court has aptly noted, "[c]onceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity." (Internal quotation marks omitted.) *Williams v. State*, 664 P.2d 137, 139 (Cal. 1983). Frequently, however, this "logical sequence of inquiry" has been overlooked and the "immunity cart has been placed before the duty horse." *Williams*, 664 P.2d at 139.

¶ 56    Even this court has addressed issues of immunity without determining whether any duty exists. See *DeSmet*, 219 Ill. 2d at 509 ("[W]e assume a defendant owes a duty, for the sake of analysis, in order to expedite the resolution of an immunity issue."). Obviously, a duty analysis is irrelevant where immunity applies, and the inverse is also true: immunity is irrelevant when there is no duty in the first place. However, putting the "immunity cart" before the "duty horse" caused applications of these concepts to become muddled, confusing, and unduly complicated.

¶ 57    When a plaintiff's cause of action is based solely on negligence, but application of a statutory immunity would be dispositive, then assuming a duty is owed expedites the resolution of the immunity issue. *DeSmet*, 219 Ill. 2d at 509. When a statute immunizes a local public entity from liability for a plaintiff's injuries, the issue of whether the local public entity owed a duty to the plaintiff is irrelevant. See *Harinek*, 181 Ill. 2d at 347 ("because we find that the [Tort Immunity] Act immunizes the City from liability for plaintiff's injuries, the question of whether the fire marshal had a special duty to plaintiff is irrelevant"). When the plaintiff claims a local public entity owed a special duty of care and the legislature has granted immunity to the local public entity, the special duty exception to the public duty rule cannot override statutory immunities. See *Zimmerman*, 183 Ill. 2d at 50; *Harinek*, 181 Ill. 2d at 347. Thus, in *Zimmerman*, this court limited application of the special duty exception to the public duty rule in cases where statutory immunities were applicable to a cause of action. Accordingly, the public duty rule and its special duty exception has proved difficult in its application when statutory immunity or limited statutory immunity applies.

¶ 58    Second, application of the public duty rule is incompatible with the legislature's grant of limited immunity in cases of willful and wanton misconduct. The legislature has deemed it appropriate to allow recovery in cases of willful and wanton misconduct. When the public duty rule is applied, however, a plaintiff is precluded from pursuing a cause of action for willful and wanton misconduct, in contravention of the clear legislative decision to allow recovery against the public entity in certain cases involving willful and wanton misconduct. The legislative intent is to impose liability upon public entities under circumstances of willful and wanton misconduct. Thus, application of the public duty rule to preclude recovery is incompatible with the legislature's grant of limited immunity.

¶ 59    Third, the determination of public policy is primarily a legislative function and the legislature's enactment of statutory immunities has rendered the public duty rule obsolete. The judicially created public duty doctrine "is based on the policy determination that when a governmental entity assumes a duty to protect the general public from harms such as criminal activity, holding the entity liable for a breach of this duty would cause municipalities to be 'mired hopelessly in civil lawsuits ... for every infraction of the law.' " *Cope v. Utah Valley State College*, 342 P.3d 243, 249 (Utah 2014) (quoting *Prosser v. Kennedy Enterprises, Inc.*,

179 P.3d 1178, 1183 (Mont. 2008)). Determination of public policy is, however, primarily a legislative function. As our appellate court has aptly recognized:

> "Courts are ill equipped to determine what the public policy should be. *** Further, establishing public policy may entail the balancing of political interests. This is a function of the legislature, not the courts." *Dixon Distributing Co. v. Hanover Insurance Co.*, 244 Ill. App. 3d 837, 852 (1993).

¶ 60    Here, the public policy behind the judicially created public duty rule and its special duty exception have largely been supplanted by the legislature's enactment of statutory immunities, rendering the public duty rule and its special duty exception obsolete.

¶ 61    For these reasons, we conclude that the underlying purposes of the public duty rule are better served by application of conventional tort principles and the immunity protection afforded by statutes than by a rule that precludes a finding of a duty on the basis of the defendant's status as a public entity. Accordingly, we hereby abolish the public duty rule and its special duty exception. Therefore, in cases where the legislature has not provided immunity for certain governmental activities, traditional tort principles apply. Obviously, if the legislature determines that the public policy requires it, it may codify the public duty rule, but we defer to the legislature in determining public policy. *Supra* ¶ 59.

¶ 62    Accordingly, we reverse and remand this cause to the circuit court for a determination of whether defendants may be held liable for willful and wanton conduct as alleged in the complaint.

¶ 63                                        CONCLUSION

¶ 64    We abolish the public duty rule and its special duty exception. We reverse the judgments of the appellate court and circuit court of Will County and remand the cause to the circuit court of Will County for further proceedings.

¶ 65    Reversed and remanded.

¶ 66    JUSTICE FREEMAN, specially concurring:

¶ 67    I agree that the time has come for this court to abandon the public duty rule and its special duty exception. Accordingly, I concur in today's judgment. However, I do so for reasons that differ from those set forth in the lead opinion and that I have expressed in two previous decisions.

¶ 68    As I explained in *Calloway v. Kinkelaar*, the public duty rule is rooted in the earliest notions of sovereign immunity. *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 334 (1995) (Freeman, J., specially concurring) (citing *Burdinie v. Village of Glendale Heights*, 139 Ill. 2d 501, 506-07 (1990), and 63 C.J.S. *Municipal Corporations* § 747 (1950)). When the 1970 Constitution was ratified, article XIII, section 4, abolished *all forms* of governmental immunity, except where provided for by legislative action. *Id.* at 336. In light of that constitutional provision, the judiciary's power to apply the public duty doctrine ceased to exist as a means of assessing municipal tort liability. *Id.* Accordingly, Illinois courts are required to view "issues of governmental tort liability—not just immunity—through the prism of existing legislation." *Id.* at 337 (citing *Henderson v. Foster*, 59 Ill. 2d 343, 349 (1974)). I repeated these

views in *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶¶ 58, 60 (Freeman, J., specially concurring), and continue to adhere to them today.

¶ 69     The lead opinion maintains that the public duty rule developed separately and exists independently of the concept of sovereign immunity. *Supra* ¶¶ 44-45, 49, 51 (citing *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 45 (1998), quoting *Huey v. Town of Cicero*, 41 Ill. 2d 361, 363 (1968)). From this premise, the lead opinion concludes that the abolition of sovereign immunity and the enactment of the Tort Immunity Act did not affect the viability of the public duty rule. *Supra* ¶ 52 (citing *Zimmerman*, 183 Ill. 2d at 45). I cannot concur in this conclusion.

¶ 70     In my view, the doctrine of sovereign immunity and the public duty rule are predicated on exactly the same concern—the notion that when a municipality performs a governmental function, the service is provided to protect the general welfare of the public. This fact is demonstrated by two of our earliest cases involving application of the doctrine of sovereign immunity to municipalities. In *Culver v. City of Streator*, 130 Ill. 238 (1889), and *Roumbos v. City of Chicago*, 332 Ill. 70 (1928), this court specifically recognized that a municipality was *immune* from tort liability when exercising a governmental function *for the benefit of the public and the general welfare*. *Roumbos*, 332 Ill. at 75, 80; *Culver*, 130 Ill. at 242-43, 245. It was recognized that, in securing the safety, health, and welfare of the public, a municipality is engaged in the performance of a *public duty* and is not liable for injuries caused in the performance of such duties. *Roumbos*, 332 Ill. at 82. Therefore, when acting in its governmental capacity to preserve the interest of the general public, a municipality represents the sovereignty of the state and is subject to suit only to the extent determined by the legislature. *Id.* at 77-78. Thus, the public duty rule has always been predicated on the very same basis as the concepts underlying local governmental immunity.

¶ 71     In addition, the public duty rule is derived from the notion that a municipality cannot be held *civilly liable* for failure to perform a duty owed to the general public. See *supra* ¶¶ 39-40 (citing *South v. Maryland*, 59 U.S. 396, 403 (1855) (holding that a breach of a public duty is punishable by indictment only), Thomas M. Cooley, A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract 379 (1880) (recognizing that a breach of a public duty can be redressed, if at all, in some form of public prosecution)). As such, it unquestionably is a rule of nonliability for civil damages, which is, at its core, the fundamental basis for sovereign immunity. Indeed, this court has previously characterized it in exactly that way. *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 506 (2006); *Zimmerman*, 183 Ill. 2d at 32, 44.

¶ 72     When viewed in the proper historical context, it is clear that the public duty rule is firmly rooted in the concept of sovereign immunity. This court has recognized as much by observing that, with respect to certain governmental services, the public duty rule was incorporated and codified in the Tort Immunity Act. *Harris*, 2012 IL 112525, ¶ 17; *DeSmet*, 219 Ill. 2d at 508-09; *Aikens v. Morris*, 145 Ill. 2d 273, 278 n.1 (1991). Moreover, this court has held that "the tort liability" of a local governmental entity or its employee is "expressly controlled by the constitutional provision and by legislative prerogative as embodied in the Tort Immunity Act." *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 489 (2001); *Zimmerman*, 183 Ill. 2d at 44; *Burdinie*, 139 Ill. 2d at 507.

¶ 73    By enacting the Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2012)), Illinois adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions. *Harris*, 2012 IL 112525, ¶ 16 (citing *Village of Bloomingdale*, 196 Ill. 2d at 489; *Barnett v. Zion Park District*, 171 Ill. 2d 378, 385-86 (1996)). In addition, article XIII, section 4, of the 1970 Illinois Constitution provides that "[e]xcept as the General Assembly may provide by law, sovereign immunity in this State is abolished." Ill. Const. 1970, art. XIII, § 4. This constitutional provision " 'now makes the General Assembly the ultimate authority in determining whether local units of government are immune from liability.' " *Harris*, 2012 IL 112525, ¶ 16 (quoting *DeSmet*, 219 Ill. 2d at 506). As a result, " 'governmental units are liable in tort on the same basis as private tortfeasors unless a tort immunity statute imposes conditions upon that liability.' " *Harris*, 2012 IL 112525, ¶ 16 (quoting *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 192 (1997)).

¶ 74    Our constitutional provision abolishing sovereign immunity and the passage of various statutes providing for certain immunities with regard to official conduct of local governmental entities constitutes a comprehensive scheme for balancing the private and public interests at stake in assessing municipal tort liability. Scrupulous application of the immunity statutes enacted by the General Assembly is the best way to achieve and maintain that balance.

¶ 75    The lead opinion cites three reasons to explain why the public duty rule must be abolished. While I have no specific quarrel with any of those reasons, I believe that the analysis set forth above mandates the same conclusion and provides a more compelling justification.

¶ 76    As a final point, I agree with the observation that the legislature is free to enact a statute that codifies the public duty rule. This approach makes perfect sense and, in my view, is the only proper means of resolving the tension between the judicially created public duty rule and the constitutional abrogation of sovereign immunity. Enactment of a statute that incorporates the substance of the rule would put all of the pieces of the puzzle in the right place—as a legislative recognition that the public duty rule is a vestige of sovereign immunity that the General Assembly has elected to provide by law.

¶ 77    In sum, I agree that the public duty rule and its special duty exception must be abolished, though I do so for reasons that differ from those expressed in the lead opinion. I also agree that where the legislature has not provided immunity for certain governmental activities, traditional tort principles apply in deciding the potential liability of municipal defendants. Finally, because the public duty rule is obsolete, I concur that the judgments of the circuit and appellate courts in this case must be reversed and the cause must be remanded for further proceedings.

¶ 78    JUSTICE THEIS joins in this special concurrence.

¶ 79    JUSTICE THOMAS, dissenting:

¶ 80    Almost 20 years ago, this court held expressly that, "[d]espite abolishing common law sovereign immunity in *Molitor*, this court has nevertheless retained the public duty rule." *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 345 (1998). Later that same year, this court explained that, because "the public duty rule exists '[i]ndependent[ly] of statutory or common-law concepts of sovereign immunity' *** neither this court's decision in *Molitor* abolishing sovereign immunity, the General Assembly's passage of the Tort Immunity

Act, nor the ratification of the 1970 Illinois Constitution altered the common law public duty rule that a governmental entity generally owes no duty to provide an individual citizen with specific municipal services." (Emphasis omitted.) *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 45 (1998) (quoting *Huey v. Town of Cicero*, 41 Ill. 2d 361, 363 (1968)). Today the court abandons these well-settled principles and abolishes the public duty rule. Justice Kilbride chooses this course because he is convinced that "serious detriment is *** likely to arise prejudicial to public interests" if a principle established in 1968 and reaffirmed in 1998 remains on the books even one more day. (Internal quotation marks omitted.) *Supra* ¶ 53. The concurring justices, by contrast, choose this course simply because they reach conclusions different from those reached in these earlier decisions. Neither of these positions is defensible, and both make a mockery of *stare decisis*. Accordingly, I dissent.

¶ 81                                Justice Kilbride's View

¶ 82     At the outset, it is worth emphasizing that what is published today as the court's "lead opinion" in this case is actually an analysis that five members of this court expressly disavow. Indeed, though the two concurring justices agree with Justice Kilbride's conclusion that the public duty rule should be abolished, they do so "for reasons that differ from those expressed in the lead opinion." *Supra* ¶¶ 67, 77. And of course we in the dissent do not reject just Justice Kilbride's analysis; we reject his conclusion, too. Thus, though it appears first under the caption and therefore might appear to the undiscerning reader to speak for the court, Justice Kilbride's analysis in fact garners less support than even this dissent. That analysis therefore should not be confused with or construed as a majority position in this case.

¶ 83     That said, Justice Kilbride's analysis starts in the right place, with an express acknowledgment that this court has "consistently held that the public duty rule survived the abolition of sovereign immunity and passage of the Tort Immunity Act." *Supra* ¶ 52. Indeed, with both certitude and precision, Justice Kilbride reminds us that "the public duty rule is *not* a form of sovereign immunity" and that this court has "already rejected" the argument that the public duty rule "[is] nothing more than a continuation of sovereign immunity and should not exist when sovereign immunity had been abolished." (Emphasis added.) *Id.* ¶ 51. And this is so, Justice Kilbride explains, because " ' "the existence of a duty and the existence of an immunity are separate issues." ' " *Id.* (quoting *Zimmerman*, 183 Ill. 2d at 45, quoting *Barnett v. Zion Park District*, 171 Ill. 2d 378, 388 (1996)). I wholeheartedly agree with all of this, and if Justice Kilbride had just stopped here, I happily would have joined his opinion.

¶ 84     Unfortunately, Justice Kilbride does not stop there. Instead, "after much reflection," he ultimately concludes that "departing from *stare decisis* and abandoning the public duty rule and its special duty exception is justified for three reasons." *Supra* ¶¶ 52, 54. Now one would think that these reasons would be manifestly compelling, as Justice Kilbride himself characterizes the public duty rule as "long-standing" (*id.* ¶¶ 38, 42) and concedes that "when a rule of law has once been settled, contravening no statute or constitutional principle, such rule ought to be followed unless it can be shown that serious detriment is thereby likely to arise prejudicial to public interests." (Internal quotation marks omitted.) *Id.* ¶ 53. But they are not compelling, not in the least. In fact, they are not "reasons" at all but rather transparent *ex post* rationalizations for a foregone conclusion, none of which holds up to even a moment's scrutiny.

¶ 85        The first "reason" that Justice Kilbride gives for departing from *stare decisis* and abandoning the long-standing public duty rule is that application of the rule has become "muddled and inconsistent" (*id.* ¶ 54), a point Justice Kilbride bolsters primarily with a 1983 decision from the California Supreme Court (*id.* ¶ 55). Now how exactly an observation made in California some 15 years before *Zimmerman* serves to prove that a principle settled in *Zimmerman* has become "muddled and inconsistent" is never made clear. Nor could it be made clear, as the quoted portion of the California Supreme Court decision hardly evinces a jurisprudence run amok. On the contrary, it merely makes the unremarkable observation that in some public duty cases, and for reasons of judicial expediency, courts will dispose of the matter on immunity grounds rather than on duty grounds. Analytical triage of this sort is standard practice in appellate review, and something this court routinely wields in a wide variety of contexts. See, *e.g.*, *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 33 ("We need not address the question of whether these amendments could be applied retroactively to the case at bar because we find that even assuming that the amendments can be applied prospectively only as plaintiff suggests, they would then merely indicate a presumption that the legislature has changed the law from not requiring any action from the employer faced with an invalid notice to now requiring the employer to respond with its reason for noncompliance, but only provided that the obligee first gives notice of the non-receipt of payment."); *Village of Mundelein v. Wisconsin Central R.R.*, 227 Ill. 2d 281, 299 (2008) ("We need not decide that issue, however, because we conclude that even if the ordinance is treated as a state statute, the saving clause does not apply."); *Bridges v. State Board of Elections*, 222 Ill. 2d 482, 490 (2006) ("We need not decide this disagreement, because even if Public Act 93–541 created additional judgeships, Public Act 94–727 clearly eliminated them ***."); *People v. Williams*, 193 Ill. 2d 1, 22 (2000) ("we need not decide which view to adopt because even if we accept that there may be instances in which collateral statements should be admitted, this is not such a case"); *In re A.P.*, 179 Ill. 2d 184, 203 (1997) ("We need not decide whether the confrontation clause requirements must be satisfied in this noncriminal setting because, even if those requirements applied, we would find them to be satisfied."); *People v. Holman*, 132 Ill. 2d 128, 152 (1989) ("We need not address these arguments, however, as we find that even if evidence of the adjudication was improperly admitted, its admission was harmless."); *People v. Harris*, 129 Ill. 2d 123, 165 (1989) ("We need not address the question raised in defendant's petition for rehearing, however, because even if we assume without deciding that defendant's claim has not been waived, defendant would not prevail on the merits of his claim."); *Edwards v. Industrial Comm'n*, 96 Ill. 2d 221, 227 (1983) ("we need not decide whether the report was properly admitted, because even if it was inadmissible, the Commission's decision is adequately supported by the manifest weight of the other evidence in the record"); *In re Marriage of Olson*, 96 Ill. 2d 432, 440 (1983) ("We need not decide whether Kenneth proves sufficient contributions to raise the presumption of transmutation because we find that even if such a presumption were raised, Geraldine successfully rebutted any presumption that a gift of the house to the marital estate was intended."). Suffice it to say, if such practice renders each of these bodies of law "muddled and inconsistent" to such a degree that the protections of *stare decisis* no longer operate, then the common law of Illinois sits on the verge of wholesale collapse. Thankfully, this is not the case, as nothing about our routine "even if" approach to decisionmaking injects confusion into the law, and therefore nothing about it justifies a departure from *stare decisis*.

¶ 86    The second "reason" that Justice Kilbride gives for departing from *stare decisis* and abandoning the long-standing public duty rule is that "the public duty rule is incompatible with the legislature's grant of limited immunity in cases of willful and wanton misconduct." *Supra* ¶ 58. According to Justice Kilbride:

> "The legislature has deemed it appropriate to allow recovery in cases of willful and wanton misconduct. When the public duty rule is applied, however, a plaintiff is precluded from pursuing a cause of action for willful and wanton misconduct, in contravention of the clear legislative decision to allow recovery against the public entity in certain cases involving willful and wanton misconduct. The legislative intent is to impose liability upon public entities under circumstances of willful and wanton misconduct. Thus, application of the public duty rule to preclude recovery is incompatible with the legislature's grant of limited immunity." *Id.*

There are two problems with Justice Kilbride's reasoning here. First, this court has explained that "a court will detour from the straight path of *stare decisis* only for articulable reasons, *and only when the court must bring its decisions into agreement with experience and newly ascertained facts.*" (Emphasis added.) *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994). As Justice Kilbride well knows, there is absolutely nothing "new" about "the legislature's grant of limited immunity in cases of willful and wanton misconduct." On the contrary, the Tort Immunity Act has provided as much since its passage in 1965 (see Ill. Rev. Stat. 1965, ch. 85, ¶ 2-202), the Emergency Telephone System Act since has provided as much since its passage in 1975 (see Ill. Rev. Stat. 1977, ch. 134, ¶ 45.1), and the Emergency Medical Services (EMS) Systems Act has provided as much since its passage in 1995 (see 210 ILCS 50/3.150 (West 1996)). And significantly, each of these legislative acts precedes *Harinek*'s express affirmation that this court "has *** retained the public duty rule." *Harinek*, 181 Ill. 2d at 345. Now, what exactly constitutes a "newly ascertained fact" sufficient to justify a departure from *stare decisis* is an open question and probably cannot be answered ahead of time for all cases. But certainly, we can all agree that whatever a "newly ascertained fact" includes, it does *not* include legislative action that *precedes* the decision at issue by decades.

¶ 87    The second problem with Justice Kilbride's invocation of the statutory exceptions for willful and wanton conduct is that, even if those exceptions *did* constitute "newly ascertained facts," those exceptions would still remain wholly irrelevant. The statutory exceptions for willful and wanton conduct are exceptions *from statutory grants of immunity*. But as Justice Kilbride repeatedly reminds us, "[t]he issue of whether a duty is owed is a separate and distinct issue from whether a defense of governmental immunity applies." *Supra* ¶ 46. As Justice Kilbride ably explains:

> "The public duty rule is not rooted in sovereign immunity nor did the public duty rule develop from any concepts of government immunity from suit. Rather, the public duty rule developed independently and separately from concepts of governmental immunity [citation] and 'is grounded in the principle that the duty of the governmental entity to "preserve the well-being of the community is owed to the public at large rather than to specific members of the community." ' " *Supra* ¶ 45 (quoting *Zimmerman*, 183 Ill. 2d at 32, quoting *Schaffrath*, 160 Ill. App. 3d at 1003).

In other words, under the public duty rule, a government entity owes no duty to begin with. This being the case, a legislative exception to a provision of statutory immunity is of no

consequence, as absent a duty there can be no liability in the first place and thus nothing to be immunized *from*. This court recognized this expressly in *Harinek* when we said that "although, absent a statutory immunity, governmental units are now liable in tort on the same basis as private tortfeasors, *the public duty rule nevertheless prevents such units from being held liable for their failure to provide adequate governmental services*." (Emphasis added.) *Harinek*, 181 Ill. 2d at 345. If the public duty rule precludes liability wholly *absent* a statutory immunity, then it likewise precludes liability when such immunity is granted but then limited.

¶ 88    Justice Kilbride's third "reason" for departing from *stare decisis* and abandoning the long standing public duty rule is that "the determination of public policy is primarily a legislative function and the legislature's enactment of statutory immunities has rendered the public duty rule obsolete." *Supra* ¶ 59. Of course, this is just another way of saying that the public duty rule did not survive the passage of the Tort Immunity Act. But the problem with this, as Justice Kilbride himself concedes, is that this court has "consistently held that the public duty rule survived the abolition of sovereign immunity and passage of the Tort Immunity Act." *Id.* ¶ 52. And as for *why* this court has "consistently held" this, no one could possibly explain it better than Justice Kilbride does:

> "The issue of whether a duty is owed is a separate and distinct issue from whether a defense of governmental immunity applies. This court has consistently held that the issue of a duty is separate from the issue of immunity from liability based on that duty. [Citations.] In *Zimmerman*, this court explained the distinction between the concepts of duty and statutory immunities after ratification of the 1970 Constitution:
>
> ' "The judicial abrogation of sovereign immunity merely abrogated a defense to any preexisting duty. [Citation.] *** Neither *Molitor*, nor any waiver of immunity creates new tort duties and liabilities. [Citations.] Under the inapplicable concept of sovereign immunity, despite any 'apparent duty,' the governmental entity is immune from tort liability. This does not occur from a denial of the tort's existence, but rather because the existing liability in tort is disallowed. In contrast, [under the rationale of the public duty rule] the tort liability or duty never existed. [Citations.]" ' *Zimmerman*, 183 Ill. 2d at 46 (quoting *Martin v. Lion Uniform Co.*, 180 Ill. App. 3d 955, 961-62 (1989)).
>
> *Zimmerman* specifically noted that '[t]he distinction between an immunity and a duty is crucial, because only if a duty is found is the issue of whether an immunity or defense is available to the governmental entity considered.' *Zimmerman*, 183 Ill. 2d at 46. Because of this distinction between duties and immunities, 'neither this court's decision in *Molitor* abolishing sovereign immunity, the General Assembly's passage of the Tort Immunity Act, nor the ratification of the 1970 Illinois Constitution altered the common-law public duty rule that a governmental entity generally owes no duty to provide an individual citizen with specific municipal services.' *Zimmerman*, 183 Ill. 2d at 45." *Id.* ¶ 46.

Thus, it is not *just* that this court has "consistently held" that the public duty rule survived passage of the Tort Immunity Act. Rather, this court also has consistently explained that the reason for this holding is that the public duty rule and the Tort Immunity Act *have nothing to do with each other*. There is absolutely nothing, then, about the "the legislature's enactment of statutory immunities" that renders the public duty rule obsolete.

¶ 89    As importantly, even if the "the legislature's enactment of statutory immunities" did somehow implicate the public duty rule, such legislative action is not a recent innovation, and it therefore cannot justify a departure from this court's consistent holding that the public duty rule has survived such action. *Huey* was decided in 1968, and it was in 1998 that *Harinek* expressly stated that "this court has *** retained the public duty rule." *Harinek*, 181 Ill. 2d at 345. How can legislative action that in one case predates even *Huey* and in all cases precedes *Harinek* possibly serve as a basis for overruling those cases in 2015? It cannot, and Justice Kilbride understandably makes no attempt to explain how it can. It is not enough simply to assert as a basis for departing from *stare decisis* propositions that this court has previously considered and "consistently" rejected. Nor is it enough to cite facts of which the court has been fully aware for half a century, as if those facts were new. The bottom line is that absolutely nothing has changed since this court's decisions in *Huey*, *Harinek*, and *Zimmerman*, and consequently nothing justifies a departure from *stare decisis* as to the principles those cases establish.

¶ 90    To summarize, then, the compelling new reasons that Justice Kilbride gives for departing from *stare decisis* and abandoning the long-standing public duty rule are that (1) the rule lends itself to the use of a common analytical tool and (2) the rule is incompatible with statutory provisions that have been on the books for decades and that this court has repeatedly held have nothing to do with the public duty rule. Neither of these reasons is credible, let alone convincing. And this matters, because the importance of *stare decisis* is that it "permits society to presume that fundamental principles are established in the law rather than in the proclivities of individuals." *Chicago Bar Ass'n*, 161 Ill. 2d at 510. That being the case, if the reasons proffered by Justice Kilbride are sufficient to justify a departure from *stare decisis* in this case, then we may as well abandon the *stare decisis* doctrine altogether. Because if *they* are good enough, then *anything* is good enough, and we need not waste our time going through the motions of what will essentially have become a hollow exercise.

¶ 91                          The Concurring Justices

¶ 92    If Justice Kilbride's *stare decisis* discussion is unconvincing, at least it has the benefit of existing, which cannot be said of the concurring justices' discussion. Indeed, the concurring justices reach conclusions wholly contrary to settled precedent of this court without even *mentioning* the *stare decisis* doctrine, let alone applying it.

¶ 93    At one point, the concurring justices assert that they "cannot concur" in the conclusion that "the abolition of sovereign immunity and the enactment of the Tort Immunity Act did not affect the viability of the public duty rule." *Supra* ¶ 69. At another point, they assert that "the public duty has always been predicated on the very same basis as the concepts underlying local governmental immunity," such that "it is clear that the public duty rule is firmly rooted in the concept of sovereign immunity." *Id.* ¶¶ 70, 72. With respect to my concurring colleagues, these are not matters for them to decide, as previous courts have spoken directly to these matters and reached entirely different conclusions. Again, *Zimmerman* states expressly that "neither this court's decision in *Molitor* abolishing sovereign immunity, the General Assembly's passage of the Tort Immunity Act, nor the ratification of the 1970 Illinois Constitution altered the common law public duty rule that a governmental entity generally owes no duty to provide an individual citizen with specific municipal services." *Zimmerman*,

183 Ill. 2d at 45. And the reason for this holding was the court's prior determination in *Huey* that "[the public duty] rule existed '[i]ndependent[ly] of statutory or common-law concepts of sovereign immunity.' " (Emphasis omitted.) *Id.* (quoting *Huey*, 41 Ill. 2d at 363). Now I understand that the concurring justices might strongly disagree with these conclusions and therefore wish that they had been on the court when *Huey* and *Zimmerman* were decided so as to speak to those decisions. But that ship has sailed, and that is not how our system works. Indeed, this court has been emphatic that "*stare decisis* *** 'expresses the policy of the courts to stand by precedents and to not disturb settled points' " (*People v. Caballes*, 221 Ill. 2d 282, 313 (2006) (quoting *Neff v. George*, 364 Ill. 306, 308-09 (1936))), and therefore we "will not depart from precedent 'merely because the court is of the opinion that it might decide otherwise were the question a new one.' " *People v. Robinson*, 187 Ill. 2d 461, 464 (1999) (quoting *Maki v. Frelk*, 40 Ill. 2d 193, 196-97 (1968)). Yet that is precisely what the concurring justices are doing here.

¶ 94    In his dissent in *People v. Mitchell*, 189 Ill. 2d 312 (2000), Justice Freeman spoke passionately in defense of the *stare decisis* doctrine. I will quote at length from that dissent, with minor modification, as I am convinced that Justice Freeman makes the best case possible in opposition to the court's action today:

"Today's result sends the unfortunate message to the bench, the bar, and the public that 'this court does not decide issues based on the law, but based instead on who happens to be sitting on the court at a particular time.' *People v. Lewis*, 88 Ill. 2d 129, 170 (1981) (Clark, J., concurring). ***

***

As I have endeavored to show by my review of our precedent, not one circumstance has changed in our [public duty rule] jurisprudence since this court announced its decision in [*Zimmerman*]. All of the legal arguments set forth in today's opinion are the same arguments that were made and considered at the time [*Huey* and *Zimmerman*] were decided. *** The only 'circumstance' that has changed since this court announced [*Zimmerman*] is that [Justices Kilbride, Burke, and Theis have since joined the court]. I submit that this type of 'circumstance' does not rise to the level necessary to overturn the doctrine of *stare decisis*.

Unfortunately, today's decision demonstrates that '[p]ower, not reason, is the new currency of this [c]ourt's decisionmaking.' *Payne v. Tennessee*, 501 U.S. 808, 844, 115 L. Ed. 2d 720, 748, 111 S. Ct. 2597, 2619 (1991) (Marshall, J., dissenting, joined by Blackmun, J.). As noted throughout this dissent, neither the law nor the facts supporting the [public duty rule] underwent any change since the time that this court issued its last [public duty rule] case, [*Zimmerman*], in 1998. Only the personnel of this court did. One must now wonder how many other of our previous decisions *** will be similarly overruled on the basis of a change in court personnel. *** If this court can so cavalierly disregard its own precedent, we surely cannot expect others to follow it nor can we justly criticize those who do not. Today's imprudent action invites nothing but open defiance of our precedent and seriously undermines this court's legitimacy. Clearly, there is no genuine reason not to apply [the public duty rule] to the present case, and the court's attempt to style its decision as one made to ["resolv[e] the tension between the judicially created public duty rule and the constitutional abrogation of

sovereign immunity" (*supra* ¶ 76)] is beyond credulity. It is obvious to me, at least, that four members of this court are willing to discard any principle of *** law that, in the past, was recognized *** and with which four justices currently disagree. This does not bode well for the future. *** It is my sincere hope that this case will not serve as a model for future courts to follow." *Mitchell*, 189 Ill. 2d at 396-99 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.).

¶ 95                                  Conclusion

¶ 96      This court has held that the public duty rule survived the abolition of sovereign immunity and passage of the Tort Immunity Act. See *Zimmerman*, 183 Ill. 2d at 45; *Huey*, 41 Ill. 2d at 363. A question once deliberately examined and decided should be considered as settled and closed to further argument unless compelling reasons require it. *Wakulich v. Mraz*, 203 Ill. 2d 223, 230-31 (2003). The doctrine of *stare decisis* is fundamental to our legal system and "reflects the policy of the courts 'to stand by precedents and not to disturb settled points.' " (Internal quotation marks omitted.) *Id.* at 230 (quoting *Zimmerman*, 183 Ill. 2d at 47). This court has examined and applied the public duty rule since abolition of sovereign immunity and passage of statutory immunities and the continued viability of the public duty rule is settled law of this state. I find no compelling legal rationale to overrule this precedent and abolish the public duty rule.

¶ 97      Moreover, I agree with those courts that have identified valid policy considerations that warrant continued judicial application of the public duty rule. The public duty rule "serves the important purpose of preventing excessive court intervention into the governmental process by protecting the exercise of law enforcement discretion." *Ezell v. Cockrell*, 902 S.W.2d 394, 400-01 (Tenn. 1995). For example, when a local public entity lacks sufficient resources to meet every need of its community, police, fire, rescue ambulance, and other emergency responders "must be able to prioritize and create responses without the benefit of hindsight." *Sawicki v. Village of Ottawa Hills*, 525 N.E.2d 468, 477 (Ohio 1988). Emergency first responders must often react in the midst of unfolding emergency situations when every decision they make is fraught with uncertainty and their own safety may be at risk. See *Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C. 1983). Indeed, the facts of this case illustrate the continuing need for the public duty rule. Here, the dispatch centers were so overwhelmed with emergency calls following a natural disaster that the community could not meet the demand for police, fire, ambulance, rescue, and other emergency first responders to the tornado disaster such that mutual aid from surrounding communities was required.[5]

_____

[5]Justice Kilbride conveniently and conspicuously omits from his opinion the highly relevant fact that, at the precise time Coretta called the Will County 911 operator, this portion of Illinois was in the midst of a major tornado outbreak and disaster event. Eight tornadoes occurred that Saturday afternoon and evening over northeast Illinois. Between 5:18 p.m. and 6:30 p.m., four EF2 tornadoes struck Will County, causing injuries and widespread damage and destruction. The first EF2 tornado struck Kankakee and Will Counties, beginning at 5:18 p.m. and ending at 5:46 p.m., with a path length of 13.6 miles. This first tornado snapped and uprooted trees, blew down power lines, and caused extensive damage to homes and buildings. A second EF2 tornado struck Will County from 5:51 p.m. to 5:55 p.m., with a path length of 1.8 miles. The second tornado occurred in an open area with few trees and structures and a few buildings were damaged or destroyed. A third EF2 tornado struck Will County from 5:55p.m. to 6:08 p.m., with a path length of 3.7 miles. This third tornado caused extensive tree

Defendants' duty in responding to 911 calls for medical and disaster related emergencies required balancing the needs of the entire community. Under circumstances such as a mass disaster, local public entities must have the flexibility to prioritize and respond to community emergencies without having their judgment questioned.

¶ 98 Additionally, "[t]he public duty doctrine is based on the policy determination that when a governmental entity assumes a duty to protect the general public from harms such as criminal activity, holding the entity liable for a breach of this duty would cause municipalities to be 'mired hopelessly in civil lawsuits ... for every infraction of the law.' " *Cope v. Utah Valley State College*, 342 P.3d 243, 248 (Utah 2014) (quoting *Prosser v. Kennedy Enterprises, Inc.*, 179 P.3d 1178, 1183 (Mont. 2008)). Local public entities often provide needed services for their communities where the risk of potential liability to individuals would discourage local public entities from providing those services.

¶ 99 For all of these reasons, this court should affirm what is true—that the public duty rule and the special duty exception to the public duty rule remain viable in Illinois. The issue of whether a local public entity owes a duty is a wholly distinct and separate inquiry from the issue of whether immunity is available as a defense to tort liability. For these reasons, I dissent from the court's judgment today and would affirm the judgments of the appellate court and circuit court of Will County.

¶ 100 CHIEF JUSTICE GARMAN and JUSTICE KARMEIER join in this dissent.

---

damage, downed power lines, and extensive damage and destruction to homes and other buildings. Coretta's call to 911 came in at 6:10 p.m.