2016 IL App (2d) 150249
No. 2-15-0249
Opinion filed October 31, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| MARITA WILLIAMS SALVI, as Successor Trustee of the Albert S. Salvi Family Trust, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 13-L-750 |
| | ) | |
| THE VILLAGE OF LAKE ZURICH, and THE ELA AREA PUBLIC LIBRARY DISTRICT, | ) ) ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (The Village of Lake Zurich, Defendant-Appellee; The Chapel, Inc.; Good Shepherd Bible Church, Inc.; Alpine Business Partnership, LLC; Barrington Christopher Club; and Zurich Meadows Apartments, LLC, Respondents in Discovery). | ) ) ) ) ) ) ) | Honorable Christopher C. Starck, Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Hudson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Marita Williams Salvi, as successor trustee of the Albert S. Salvi Family Trust (Trust), appeals the dismissal of her claims against defendant the Village of Lake Zurich (Village).    Plaintiff's amended complaint alleged that the Village's renovation of a detention

pond (Pond) near an office building (Building) on property (Property) owned by plaintiff caused the Pond to overflow during a heavy rain, flooding the bottom floor of the Building. The trial court dismissed the claims as barred by the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2014)). For the reasons that follow, we affirm in part, reverse in part, and remand the cause for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3     Plaintiff filed her amended complaint in January 2014, naming as defendants the Village and the ELA Area Public Library District (Library). She also named several respondents in discovery. The Library and the respondents were dismissed pursuant to a settlement before plaintiff filed her notice of appeal.

¶ 4     The general allegations in the complaint are as follows. Plaintiff was the current trustee of the Trust and the current owner of the Property, which was in the Village and improved with the Building. The Property and the Building were held by the Trust. Prior to 1989, the Federal Deposit Insurance Corporation (FDIC) owned the Property as well as a contiguous parcel, later known as the Good Shepherd Subdivision (Subdivision). In 1989, Albert S. Salvi, plaintiff's predecessor in interest, purchased the Property from the FDIC and placed it with the Trust. The Pond was situated in the Subdivision. The Property "extend[ed] in part onto the slopes of the Pond." At the time of the purchase, "the Pond had no history of overflowing." Sometime after 1989, Good Shepherd Church (Church) purchased the Subdivision from the FDIC. The Subdivision was later divided into four parcels. One parcel was purchased by the Library (Library Parcel) and another parcel by the Village (Village Parcel). The remaining two parcels were retained by the Church. On one of these parcels (Church Parcel), the Church constructed a

church building.  On the remaining parcel was the Pond (Pond Parcel).  All four parcels were located north and west of the Property.   The only parcel contiguous to the Property was the Pond Parcel.

¶ 5      In the summer of 2000, the Church, the Village, and the Library signed an "Easement Agreement" (Agreement), a copy of which was attached to the complaint.  The Agreement characterized the Pond as a "storm water detention basin *** serving the storm water management requirements of the Library Parcel, the Village Parcel, the Church Parcel, and the Pond Parcel ***."   The stated purpose of the Agreement was to "permanently protect the establishment, use, and maintenance of the [Pond] for its intended purposes."   To this end, the Church granted two types of easements over the Pond Parcel.   First, to both the Village and the Library, the Church granted "a perpetual, nonexclusive easement over, across, under, upon, along, and through *** [the Pond Parcel] *** for the purpose of discharging storm water into the [Pond]."   In connection with the discharge easement, the Village was granted "a perpetual, nonexclusive easement over, across, under, upon, along, and through *** [the Pond Parcel] *** for the purpose of maintaining, repairing and replacing the storm water laterals, culverts, drains, and associated laterals, lines, and devices ***, such work to be at the Village's cost."   Second, the Agreement granted the Village "a perpetual, nonexclusive easement over, across, under, upon, along, and through *** [the Pond Parcel] *** for the purpose of rehabilitation and maintenance of [the Pond] ***."

¶ 6      Plaintiff alleged that subsequent improvements to the Village and Library Parcels and renovation of the Pond contravened requirements set forth in the Agreement and in Lake County's Watershed Development Ordinance (Watershed Ordinance) (Lake County Watershed Development Ordinance (amended Aug. 14, 2001)).   According to plaintiff, the violations led ultimately to the overflow of the Pond and the flooding of the Building.

¶ 7    We note that, in various places, the complaint describes the Agreement as granting the Village "the perpetual right to possess, manage and control the Pond Parcel."   Plaintiff also alleged that the Village "acquired *** the Pond Parcel," and she characterized the Pond as "the Village's Pond."   Though the Village did not file an answer below (having filed a motion to dismiss in lieu of an answer), it challenges on appeal the accuracy of the complaint's description of the Village's interest in the Pond and the Pond Parcel.

¶ 8    The Agreement contains the following provision relating to the Pond's capacity:

> "Section 3.    Capacity of Detention Pond.    [The Pond] was designed and constructed to accommodate maximum storm water flows (the 'Pond Capacity') from the Library Parcel, the Village Parcel, the Church Parcel, and the Pond Parcel, with a maximum of 60 percent impervious surface coverage (the 'Maximum Coverage') per parcel.   [The parties] agree that they shall take no action that inhibits, impairs, or interrupts the function of [the Pond] or results in discharge in excess of the Maximum Coverage.   In protecting the function of [the Pond], the Village shall not approve or permit additional or increased storm water discharge into [the Pond] by or for the benefit of any user not a party to this Agreement beyond use which currently exists."

The Agreement notes that the Village had approved plans for the construction of a library facility on the Library Parcel and a police station on the Village Parcel.   In this connection, the Agreement specifies that "[n]o development of the Village Parcel, the Church Parcel, the Pond Parcel, or the Library Parcel shall be permitted in excess of the Maximum Coverage except only if the Church, the Library, the Village, or other developer of such parcel, as the case may be, shall provide for an increase in the Pond Capacity at such developer's cost and in a manner and

amount satisfactory to the Village Engineer, whose approval shall not be unreasonably withheld."

¶ 9    The Agreement not only grants the Village an easement for rehabilitation and maintenance of the Pond, but requires the Village to perform that work when necessary and provides for the sharing of costs associated with the work.   The Agreement notes that the Village had submitted to the Church and the Library "a preliminary analysis and estimate of the work related to the rehabilitation and future maintenance of [the Pond]."   An attachment to the Agreement sets forth the proposed work, which includes excavation and reshaping of the Pond's slopes.

¶ 10    The Watershed Ordinance was enacted in October 1992 and has since been amended several times.   Plaintiff's complaint makes extensive reference to the Watershed Ordinance.   The complaint contains two significant block quotations from the Watershed Ordinance.   The first is from the "purpose" section of the ordinance (Lake County Watershed Development Ordinance, art. IB. (amended Aug. 14, 2001)).   Several specific purposes are listed, including the objectives of preventing flooding and drainage hazards, specifically those stemming from "development," and protecting buildings and improvements from flood damage "to the greatest extent possible." Lake County Watershed Development Ordinance, art. IB.6. (amended Aug. 14, 2001). The complaint also quotes a section stating that "[n]o person, firm, corporation or governmental agency" may commence certain developments without obtaining "a Watershed Development Permit from the Stormwater Management Commission or, if applicable, the Certified Community."   Lake County Watershed Development Ordinance, art. IVA.1. (amended Aug. 14, 2001).   The Watershed Ordinance grants certified communities the power to enforce its

requirements. Lake County Watershed Development Ordinance, art. III (amended Aug. 14, 2001). At all times relevant here, the Village was a certified community.

¶ 11    Following the complaint's quotations from the Watershed Ordinance is a three-page enumerated list of mandates from the Watershed Ordinance. Plaintiff alluded to, *inter alia*, (1) platting and reporting requirements relating to runoff and base flood elevation (BFE); (2) design dictates for stormwater detention facilities; and (3) limits on detention release rates. After each requirement is a specific citation to a provision of the Watershed Ordinance.

¶ 12    The general allegations of the complaint proceed to state that, in addition to "having the legal duty to comply with" the Watershed Ordinance, the Village and the Library "had a common law duty to refrain from collecting water and discharging it onto [the Property]."

¶ 13    The general allegations go on to describe: (1) the development of the various parcels; (2) the work that the Village performed on the Pond; and (3) the flood that resulted from those activities. The allegations state as follows. In 2002, the Village commenced work on the Pond. The Village knew of its obligations under the Watershed Ordinance but "utterly disregarded the law" in "reconstructing and thereafter maintaining the Pond so that the Pond, upon overflowing, would spill onto" the Property. Subsequent to the Village's work on the Pond, the Village constructed a police station on the Village Parcel and the Library constructed a library facility on the Library Parcel. Both entities made their improvements without "obtain[ing] the necessary permits under [the Watershed Ordinance]," and the Village also "disregarded its own ordinance and [the Agreement] by building a police department with impervious surface coverage in excess of 60%." (As to the Village's alleged violation of "its own ordinance," plaintiff provided more detail in count III against the Village.) Plaintiff alleged that, "[a]s the Village allowed additional private development of [the Subdivision]

without compliance with [the Watershed Ordinance] and [the Agreement], the threat of flooding [the Building] grew." In April 2013, "after heavy rains, the shoreline of the Pond crept perilously close to [the Property]." Though the Village placed sandbags "along or near the property line of the Village-controlled Pond and [the Property]," the Pond overflowed on June 26, 2013, spilling water into the lower floor of the Building.

¶ 14 Plaintiff's complaint contains eight counts. Counts I, II, III, VI, and VII named the Village. Count I alleged "willful and wanton trespass," count II alleged "negligent trespass *** breach of duties imposed by [the Watershed Ordinance]," and count III alleged "negligent trespass *** breach of common law duties." Counts I through III, like the remaining counts, incorporated all of the general allegations, including the allegation that the development of the Library Parcel contravened the Agreement and the Watershed Ordinance. The allegations specific to counts I through III, however, focused on the Village's rehabilitation of the Pond and the Village's later development of the Village Parcel. Both counts I and II alleged that the rehabilitation and development violated the Agreement and the Watershed Ordinance, but count I alleged that the violations were willful and wanton, while count II alleged that the violations were merely negligent. With specific citations to the Watershed Ordinance, counts I and II alleged the following ways in which the Village departed from the Watershed Ordinance in rehabilitating the Pond:

"(a) Failed to calculate, or properly calculate, the Base Flood Elevation (BFE) and failed to calculate BFE based on offsite tributary area ***.

(b) Failed to prepare plats and plans which depict, or accurately depict, the location of the Pond and the BFE and/or the Pond and the BFE in relation to [the Property] ***.

(c) Failed to prepare run-off calculations based on intense rainfalls ***.

(d) Failed to calculate volume of detention storage in addition to existing storage ***.

(e) Failed to make proper determination of release rates and to calculate the release rates for the Pond based on offsite drainage area and the available capacity of the 30[-]inch outlet ***.

(f) Failed to plan, design and construct a safe overland flow route in case of emergency overflow so as to avoid damage to structures including [the Building] ***.

(g) Failed to plan, design and construct the Pond taking into account the area of offsite tributary ***.

(h) Failed to obtain [a] dam safety permit ***.

(i) Failed to plan, design and construct the Pond so that all structures in parcels containing or adjoining to an overland flow path have a lowest adjacent grade a minimum of one foot above the design high water elevation ***.

(j) Failed to prepare as[-]built designs that would reveal violations of [the Watershed Ordinance] ***.

(k) Constructed the Pond—a stormwater detention facility—within a regulatory flood plain and constructed the Pond without determinations of BFE and added a restricted outlet (without redesign of [the] Pond to a safe BFE) and with a high water elevation that extended onto the [Property] making the [Property] a *de facto* spillway for the Pond ***.

(l) Failed to inspect its own property (the Pond and the Village Parcel) or made an inspection not adequate to ascertain its condition as violative of [the] law."

¶ 15    Counts I and II alleged that the Village "was able to avoid having its illegal conduct detected by law enforcement authorities, including the Lake County Storm Water Management Commission (SMC), by failing to inform SMC or state authorities of its acquisition of the Pond Parcel, its illegal 'rehabilitation' of the Pond, and its later maintenance and repair to the Pond from 2003 through 2013." Plaintiff further alleged that the police station subsequently constructed on the Village Parcel "had an impervious surface area greater than 60%." According to plaintiff, "[t]his development created additional discharge of stormwater flowing into the Pond, making it more likely that [the Property] would become the Pond's spillway." Further, "despite the fact that the Village['s] development of the surrounding lands made the illegal rehabilitation even more dangerous with the addition of developments that did not comply with legal requirements, the Village never warned [p]laintiff that her property had been made a spillway to accommodate its development." The Village "failed to inspect its Pond, or failed to adequately inspect for the aforesaid violations[,] and the Village never prepared plans compliant with [the Watershed Ordinance], thus making the illegal 'rehabilitation' more and more perilous to [the Property]."

¶ 16    Both counts I and II further alleged that, as a direct and proximate result of the Village's "acts and omissions *** and concealment [of them]," the Pond "received waters from a heavy rain, rose to such a level it would otherwise not have risen, and spilled onto the [Property]."

¶ 17    Count III related the same history concerning the rehabilitation of the Pond, the development of the Village Parcel, and the flooding of the Building. In count III, however, plaintiff asserted liability based on (1) the Village's "common law duties not to cast water upon the property of its neighbor" and (2) the Village's own ordinances. Plaintiff alleged the following specific breaches or violations:

"(a) In April, 2013, failed to properly place sandbags upon the shoreline so as to prevent water in [the Pond] from pouring onto [the Property];

(b) In April, 2013, failed to place a sufficient number and quantity of sandbags between the waterline and [the Property], so as to prevent water in [the Pond] from pouring onto [the Property];

(c) Failed to maintain sandbags after April, 2013, through June 25, 2013, in adequate numbers so as to prevent water in [the Pond] from pouring onto [the Property];

(d) Failed to maintain sandbags after April, 2013, through June 26, 2013, in a proper place so as to effectively contain water within the Village's Pond and so that the water would not pour into [the Building] upon [the Property];

(e) In 2000 and thereafter, failed to properly design, plan, supervise, observe or manage the construction of the shoreline of [the Pond] to assure that when the [P]ond overflowed, its water would not all spill onto [the Property];

(f) Failed to provide open grate catch basins at an elevation necessary to receive surface water runoff before such runoff from the Village Pond could spill onto [the Property];

(g) Failed to provide storm water sewer drainage away from [the Property] as quickly as possible and discharge into the storm water sewer system, as required by Village Ordinance Title 10, Chapter 6, Section 4;

(h) Failed to require the vacant, non-buildable areas of development adjacent to [the Building] to be graded to drain into the storm sewerage system, as required by Village Ordinance Title 10, Chapter 5, Section 4;

(i) Failed to inspect and test storm sewers and appurtenance adjacent to, upon or serving [the Pond] in violation of Village Ordinance Title 10, Chapter 6, Section 4(r);

(j) Constructed a shoreline to [the Pond] with such a topography that [the Property] would be a bypass channel functioning as a duct to carry the Village's storm and floodwater runoff away from other areas and onto [the Property];

(k) Otherwise acted negligently to allow waters from the Pond to spill onto [the Property];

(l) Failed to inspect its own property (the Pond and the Village Parcel) or [to make] an inspection adequate to ascertain its condition as violative of [the] law."

The balance of count III repeated essentially the same allegations contained in counts I and II.

¶ 18    Count VI asserted "plaintiff third party beneficiary—breach of contract" based on the following violations of the Agreement:

"(a) In 2006 and 2007, [the Village] built upon and improved the Village Parcel so that it had impervious coverage greater than 60%, thus increasing discharge of water into the Pond;

(b) In 2004 through 2005, the Village approved development upon the Church [P]arcel which had impervious coverage greater than 60%, thus increasing discharge of water into the Pond;

(c) The Village failed to undertake all necessary rehabilitation and future maintenance of the Pond as required by [the Watershed Ordinance] and to the fullest extent possible without causing the high water elevation of the Pond to be expanded outward;

(d) The Village permitted development within the [S]ubdivision with improvements that created impervious coverage to exceed 60%;

(e) The Village's action that inhibits, impairs, or interrupts the function of the Pond; and

(f) The Village, after improving its properties, and after otherwise permitting the Village Parcel, the Library Parcel, and the Church Parcel to have impervious coverage that exceeds 60%, have [*sic*] failed to provide for an increase in Pond capacity."

Plaintiff alleged that, as a direct and proximate result of these breaches, the Pond overflowed and flooded the Building.

¶ 19    In count VII, the last of the five counts against the Village, plaintiff sought a writ of *mandamus* directing the Village to take the following actions to bring the Village Parcel and the Pond into compliance with the Agreement and the Watershed Ordinance:

"A. To redesign and construct the Village Parcel so that it has no more than a 60% impervious surface coverage, and/or;

B. Modify the Pond to lower the BFE, and/or;

C. To report to the Lake County Stormwater Management Commission that it has developed the Village Parcel and the Pond Parcel in violation of [the Watershed Ordinance], and/or;

D. To build appropriate levy and berms to protect [the Property], and/or;

E. To redesign and reconstruct the Pond Parcel and [the] Pond so that the Pond, its design, construction, and maintenance compl[y] with the mandates of [the Watershed Ordinance]."

¶ 20   The Village filed a hybrid motion to dismiss all counts against it, pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2014)).   The Village made several contentions that plaintiff's complaint failed to state a cause of action and so should be dismissed under section 2-615 of the Code (735 ILCS 5/2-615 (West 2014) (dismissal of claims because of a legal deficiency appearing on the face of the complaint)).   One such contention was that, under the public-duty rule, the Village owed plaintiff no duty of care in connection with the matters plaintiff alleged.   See *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 32 (1998) ("The public duty rule is a long-standing precept which establishes that a governmental entity and its employees owe no duty of care to individual members of the general public to provide governmental services, such as police and fire protection.").   The Village also cited, as "affirmative matter avoiding the legal effect of or defeating [plaintiff's] claim[s]" (735 ILCS 5/2-619(a)(9) (West 2014)), four provisions of the Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2014)).   The Village cited sections 2-103, 2-104, 2-202, and 3-105 of the Tort Immunity Act (745 ILCS 10/2-103, 2-104, 2-202, 3-105 (West 2014)).   Following a hearing, of which there is no transcript in the record, the court issued a written order dismissing all counts against the Village.   The order stated no reasons for the dismissal.

¶ 21   Plaintiff filed a motion to reconsider.   This, too, was brought to hearing but there is no transcript in the record.   In its written order denying the motion, the court found all claims against the Village barred because "the flood was an act of God; the tort immunity cited by [the Village] immunized the Village from liability."

¶ 22   Plaintiff filed this timely appeal.

¶ 23                                    II. ANALYSIS

¶ 24                                    A. Preliminary Discussion

¶ 25　Plaintiff challenges the dismissal of her first amended complaint. The Village's hybrid motion under section 2-619.1 of the Code invoked the standards of section 2-615 and section 2-619 of the Code. A motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of a complaint, based on defects apparent on its face. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). In contrast, a motion to dismiss pursuant to section 2-619 admits the legal sufficiency of the complaint but asserts some other matter that defeats the claim. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. For instance, subsection (a)(9) of section 2-619 provides for dismissal of a claim that is "barred by *** affirmative matter avoiding the legal effect of or defeating the claim" (735 ILCS 5/2-619(a)(9) (West 2014)). An "affirmative matter" under section 2-619(a)(9) is " 'something in the nature of a defense which negates the cause of action completely ***.' " *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003) (quoting *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994)). Here, the trial court held that plaintiff's claims were barred by the Tort Immunity Act. The immunity granted by the Tort Immunity Act is an affirmative matter properly raised in a section 2-619(a)(9) motion to dismiss. *Id.* We review *de novo* the dismissal of a complaint pursuant to section 2-619(a)(9). *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 115 (2008).

¶ 26　Our threshold task is to clarify the distinctions, as we see them, among the five counts against the Village. We are prompted to do so by the parties' disagreement over whether, as the trial court assumed, the Tort Immunity Act applies to all five counts. The parties' specific quarrel is over the proper characterization of counts VI and VII.

¶ 27　Section 2-101 of the Tort Immunity Act (745 ILCS 10/2-101 (West 2014)) clarifies the kinds of claims to which its immunity applies. First, "[n]othing in this Act affects the right to obtain relief other than damages against a local public entity or public employee." *Id.*

Second, "[n]othing in this Act affects the liability, if any, of a local public entity or public employee, based on *** [c]ontract." 745 ILCS 10/2-101(a) (West 2014).

¶ 28 The Village claims that counts VI and VII are properly construed as having tort elements, because they allege (either directly or by incorporation of the complaint's general allegations) that the Village had a legal duty to comply with the Watershed Ordinance and with common-law restraints on water drainage. The Village is mistaken. First, whether count VII has tort elements is inapposite to whether the Tort Immunity Act applies, because the relief sought is not damages but a writ of *mandamus*. *Cf. People ex rel. Birkett v. City of Chicago*, 325 Ill. App. 3d 196, 204 (2001) (the Tort Immunity Act does not bar actions for injunctions). Second, as to count VI, its references to the Watershed Ordinance and common-law duties do not change the character of the count. The focus of count VI is the Village's duties under the Agreement, and to the extent that the count references duties outside the Agreement, we may disregard them as surplusage and so preserve the integrity of the count as a claim for breach of contract. See *Cole v. Guy*, 183 Ill. App. 3d 768, 773-74 (1989) ("If a complaint contains allegations that are not necessary to the plaintiff's cause of action, a court will treat those allegations as mere surplusage, which does not destroy the sufficiency of the plaintiff's complaint."). Consequently, counts VI and VII fall within express exclusions in section 2-201 of the Tort Immunity Act.

¶ 29 The Village, however, proposes independent grounds for sustaining the dismissal of counts VI and VII. We will consider them below. At present, we examine the dismissal of counts I through III, which are the tort claims.

¶ 30                                    B. Counts I through III

¶ 31 As we turn to counts I through III, we note that they overlap with count VI in the further respect that each alleges violations of the Agreement in connection with the development of the

parcels surrounding the Pond. However, in counts I through III, the allegations regarding the Agreement appear mostly by incorporation of the general allegations, the sole reference among the counts' specific allegations being a comment that the police station built by the Village had "impervious surface area greater than 60%." As this allegation is ancillary to counts I through III but is the focus of count VI, our consideration of the Agreement is reserved for our discussion of count VI.

¶ 32 The conduct at issue in counts I through III is: (1) the Village's development and maintenance of the Pond; (2) the Village's development of the Village Parcel; and (3) the Library's development of the Library Parcel, which the Village "allowed." Counts I and III allege negligence and count II alleges willful and wanton conduct. For standards of care, counts I and II cite the Watershed Ordinance, while count III cites both the Village's own ordinances and common-law standards.

¶ 33 The trial court found all three counts barred by the Tort Immunity Act. The Village defends the finding of immunity but also proposes an alternative basis for affirming the dismissal. As it did below in moving for dismissal, the Village contends that it did not owe plaintiff a duty of care. This is a question distinct from, and precedent to, the question of whether the Tort Immunity Act applies. "The distinction between an immunity and a duty is crucial, because only if a duty is found is the issue of whether an immunity or defense is available to the governmental entity considered ***." *Zimmerman*, 183 Ill. 2d at 46.

¶ 34 In general, unless an immunity provision applies, municipalities are liable in tort to the same extent as private parties. *Van Meter*, 207 Ill. 2d at 368-69. Thus, in *Van Meter*, our supreme court held that the common-law duty not to increase the natural flow of surface water onto the property of adjacent landowners applied to both private and public landowners. See *id.*

at 369; see also *Gass v. Metro-East Sanitary District*, 186 Ill. App. 3d 1077, 1092-93 (1989) (sanitary district owed duty to maintain canal in a condition sufficient to provide an outlet for the waters of floods or freshets "as men of ordinary prudence could have foreseen" (internal quotation marks omitted)). Counts I, II, and III all allege trespass (willful and wanton in count I, negligent in counts II and III), which is clearly a tort applicable to private parties. Thus, in general, counts I, II, and III allege torts that are applicable to both private and public entities, and the Village owed plaintiff a duty of care.

¶ 35 The Village also argues that every count directed against the Village is premised largely upon the Watershed Ordinance; however, the Watershed Ordinance prohibits using its terms to create liability. Article VIII of the ordinance, entitled "DISCLAIMER OF LIABILITY," states:

"It is recognized that although the degree of flood protection required by this ordinance is considered reasonable for regulatory purposes and is based on scientific and engineering considerations, on occasions greater floods can and will occur, and flood heights may be increased by man-made or natural causes. These provisions do not imply that land outside the flood-plain areas or that uses permitted within such areas will be free from flooding or flood damages. These provisions shall not create liability on the part of the Stormwater Management Commission nor any Certified Community nor any officer or employee thereof for any claims, damages or liabilities that result from reliance on this Ordinance or any administrative decision lawfully made thereunder." Lake County Watershed Development Ordinance, art. VIII (amended Aug. 14, 2001).

Thus, according to the Village, liability cannot be created against it under the Watershed Ordinance.

¶ 36    We disagree.    The Watershed Ordinance states that its provisions "shall not create liability *** for any claims, damages or liabilities *that result from reliance on this Ordinance or any administrative decision lawfully made thereunder*."    (Emphasis added.)    *Id.*    Plaintiff alleges that her damages arose, not because the Village relied on the Watershed Ordinance and made decisions based on its requirements, but because the Village *ignored* the ordinance, did not follow its strictures, and did not lawfully make administrative decisions pursuant to it.    The disclaimer of liability seeks to protect governmental entities that follow the Watershed Ordinance's requirements, not those who ignore them.    Therefore, the disclaimer does not bar liability on the part of the Village.

¶ 37    The Village also invokes the public-duty rule as a basis for finding no duty of care, arguing that, under the rule, a municipality and its employees owe no duty to provide an individual citizen with specific municipal services such as police and fire protection, or to enforce local laws and building codes.    See *Belton v. Forest Preserve District*, 407 Ill. App. 3d 409, 426 (2011).    However, our supreme court has recently abolished the public-duty rule. See *Coleman v. East Joliet Fire Protection District*, 2016 IL 117952.    Thus, we will proceed to the Tort Immunity Act.

¶ 38    The Tort Immunity Act "serves to protect local public entities and public employees from liability arising from the operation of government."    *Van Meter*, 207 Ill. 2d at 368.    "By providing immunity, the General Assembly sought to prevent the dissipation of public funds on damage awards in tort cases."    *Id*.    "The Tort Immunity Act grants only immunities and defenses; it does not create duties.    Rather, the Tort Immunity Act merely codifies existing common-law duties, to which the delineated immunities apply."    *In re Marriage of Murray*, 2014 IL App (2d) 121253, ¶ 36.    "Since the [Tort Immunity] Act was enacted in derogation of

the common law, it must be strictly construed." *Van Meter*, 207 Ill. 2d at 368. "Unless an immunity provision applies, municipalities are liable in tort to the same extent as private parties." *Id.* at 368-69. "Because the immunities afforded to governmental entities operate as an affirmative defense, those entities bear the burden of properly raising and proving their immunity under the Act." *Id.* at 370. Immunity under the Tort Immunity Act is an affirmative matter properly raised in a section 2-619(a) motion to dismiss. *Id.* at 367. We review *de novo* a construction of the Tort Immunity Act. *Smith*, 231 Ill. 2d at 115.

¶ 39 In its motion to dismiss, the Village cited four sections of the Tort Immunity Act and now relies on those same sections. They are sections 2-103, 2-104, 2-206, and 3-105 (745 ILCS 10/2-103, 2-104, 2-206, 3-305 (West 2014)). Section 2-103 provides: "A local public entity is not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law" (745 ILCS 10/2-103 (West 2014)).

¶ 40 Denying that section 2-103 applies here, plaintiff notes that the dictionary definition of "enforce" is "[t]o give force or effect to (a law etc.); to compel obedience to" (Black's Law Dictionary 549 (7th ed. 1999)). See *People v. Dabbs*, 239 Ill. 2d 277, 288 (2010) (dictionary definitions may be consulted to determine the plain and ordinary meaning of a statutory term). Plaintiff concludes from this definition that:

"the obvious intent of this immunity is to insulate municipalities like the Village from liability for failures to enforce its own ordinances. To suggest the immunity protects the Village from having to follow the laws of the Federal, State or County governments is to ascribe a meaning to the statute that conflicts with its clear language."

¶ 41 Plaintiff presses here a distinction between nonenforcement and noncompliance. We agree with this distinction. The distinction existed before the Tort Immunity Act's passage in

1965. The common law has long distinguished, for liability purposes, between (1) injuries tied to a local public entity's passivity and (2) injuries tied to its activity. For instance, our supreme court has observed that section 2-103 codifies (at least in part) the common-law public-duty rule, namely, that "municipalities are not liable in tort to members of the general public for failure to enforce local laws or ordinances." *Burdinie v. Village of Glendale Heights*, 139 Ill. 2d 501, 507-08 (1990) (citing Ill. Rev. Stat. 1989, ch. 85, ¶ 2-103), *overruled on other grounds by Coleman*, 2016 IL 117952. Although the public-duty rule was recently abolished by the supreme court (see generally *Coleman*, 2016 IL 117952), this did not impact its codification in section 2-103.

¶ 42 Failure to enforce local laws or ordinances was not the only kind of passivity that the common law generally insulated from liability. A municipality has no duty under the common law to make public improvements. *West v. Kirkham*, 147 Ill. 2d 1, 14 (1992). However, "[o]nce a municipality decides to perform a public work, the municipality must perform the public work with reasonable care and in a nonnegligent manner." *Trtanj v. City of Granite City*, 379 Ill. App. 3d 795, 806 (2008) (citing *Snyder v. Curran Township*, 167 Ill. 2d 466, 474-75 (1995)). This general duty of care encompasses the more specific duty "not to increase the natural flow of surface water onto the property of an adjacent landowner." *Van Meter*, 207 Ill. 2d at 369. The duty of care also includes the duty to comply with relevant statutes and ordinances that are designed to protect human life or property (as is, apparently, the Watershed Ordinance). See *Parsons v. Carbondale Township*, 217 Ill. App. 3d 637, 648 (1991) (holding that township's violation of a provision of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, ¶ 11-304) on placement of traffic control devices was *prima facie* evidence of negligence).

¶ 43    Section 3-103(a) of the Tort Immunity Act codifies this common-law duty of care in the making of public improvements.   745 ILCS 10/3-103(a) (West 2014).   Section 3-103(a) insulates a local public entity from liability "for an injury caused by the adoption of a plan or design of a construction of, or an improvement to public property," but it states that the entity will be liable "if after the execution of such plan or design it appears from its use that it has created a condition that is not reasonably safe."   *Id.*   The liability recognized here stems from the public entity's activity (which might involve noncompliance with an enactment).   Section 3-103(a) buttresses the conclusion that what the legislature meant to insulate by way of section 2-103 was strictly the passivity of nonenforcement.

¶ 44    Plaintiff does not allege merely that the Village failed to stop other parties from violating the Watershed Ordinance and causing water to spill onto the Property.   Instead, plaintiff alleges that the Village itself failed to follow the Watershed Ordinance and was therefore liable for the damage to the Property when the Pond overflowed its banks.   Paragraph 50 of count I and paragraphs 51 of counts II and III list 12 specific failures of the Village to follow the strictures of the Watershed Ordinance as it related to the reconstruction of the Pond, and plaintiff also raises allegations regarding the development of the Village Parcel as it related to excess impervious surface area and the reconstruction of the Pond such that it became a spillway onto the Property. These allegations have nothing to do with failing to *enforce* the law; they have everything to do with failing to *follow* the law.   Thus, section 2-103 provides no immunity to the Village.

¶ 45    Sections 2-104 and 2-206 of the Tort Immunity Act grant immunity to local public entities and public employees for injuries caused by the issuance, denial, suspension, or revocation of, or by the failure or refusal to issue, deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization where the entity or employee is authorized

by enactment to determine whether the authorization should be issued, denied, suspended, or revoked.    See 745 ILCS 10/2-104 (entities), 2-206 (employees) (West 2014).

¶ 46    We conclude that sections 2-104 and 2-106 of the Tort Immunity Act provide no immunity to the Village.    Plaintiff does not allege that the Village or any of its employees improperly determined whether some "permit, license, certificate, approval, order or similar authorization" should or should not have been issued.    It is the Village's actions in reconstructing the Pond and developing the Village Parcel, not its administrative actions regarding permits or approvals for such reconstruction and development, that form the basis of plaintiff's contentions in counts I, II, and III.

¶ 47    We next consider the immunity provided by section 3-105(a) of the Tort Immunity Act, which provides:

> "Neither a local public entity nor a public employee is liable for an injury caused by the effect of weather conditions as such on the use of streets, highways, alleys, sidewalks or other public ways, or places, or the ways adjoining any of the foregoing, or the signals, signs, markings, traffic or pedestrian control devices, equipment or structures on or near any of the foregoing or the ways adjoining any of the foregoing.    For the purpose of this section, the effect of weather conditions as such includes but is not limited to the effect of wind, rain, flood, hail, ice or snow but does not include physical damage to or deterioration of streets, highways, alleys, sidewalks, or other public ways or place or the ways adjoining any of the foregoing, or the signals, signs, markings, traffic or pedestrian control devices, equipment or structures on or near any of the foregoing or the ways adjoining any of the foregoing resulting from weather conditions."    745 ILCS 10/3-105(a) (West 2014).

According to the Village, plaintiff's complaint "clearly alleges that it was a heavy rain that ultimately caused the water to overflow into the pond." The Village then argues that "[d]amages caused by the effect of weather conditions, which specifically includes rain, are immunized pursuant to Section 3-105." Further, the Village avers, there are no exceptions to the section 3-105 immunity, and plaintiff is asking this court "to create exceptions for the weather conditions when the legislature has not." We disagree.

¶ 48     We first note that section 3-105(a) provides immunity for injuries caused by the "effect of weather conditions as such on the use of streets, highways, alleys, sidewalks or other public ways, or places, or the ways adjoining any of the foregoing." *Id.* However, the damage in this case was not alleged to have been caused by the effect of weather on streets or sidewalks. Plaintiff alleged that the flooding of the Building was caused by the Village's errors in reconstructing the Pond and in developing the Village Parcel near the Pond. The classic applications of section 3-105 are to accumulations of snow or ice on streets and sidewalks (see, *e.g.*, *Ziencina v. County of Cook*, 188 Ill. 2d 1 (1999); *Rios v. City of Chicago*, 331 Ill. App. 3d 763 (2002)) and to defective streets and sidewalks (see, *e.g.*, *Horton v. City of Ottawa*, 40 Ill. App. 3d 544 (1976)). We fail to see how section 3-105 applies here, and we conclude that section 3-105 provides no immunity to the Village.

¶ 49     We also note that, in denying plaintiff's motion to reconsider, the trial court remarked that "the flood was an act of God; the tort immunity cited by [the Village] immunized the Village from liability." Perhaps "act of God" was a reference to section 3-105 of the Tort Immunity Act. Perhaps "act of God" was a reference to the common-law doctrine of that name. " 'A loss or injury is due to the act of God[] when it is occasioned exclusively by natural causes such as could not be prevented by human care, skill[,] and foresight.' " *Evans v. Brown*, 399 Ill. App. 3d

- 23 -

238, 246 (2010) (quoting *Wald v. Pittsburgh, Cincinnati, Chicago & St. Louis R.R. Co.*, 162 Ill. 545, 551 (1896)). "[L]iability is only precluded if the alleged act of God constitutes the *sole and proximate cause* of the injuries." (Emphasis added.) *Id.* Plaintiff alleged that the Pond overflowed following "heavy" rains, but whether the rain was the "sole and proximate" cause of the alleged injuries is a question of fact inappropriate for resolution at this stage in the proceedings.

¶ 50 How the trial court came to rely on the "act of God" doctrine, if indeed it did, is perplexing, because the Village did not raise the doctrine in its pleadings. The Village might have raised it at one or both of the hearings on the pleadings, or the court might have raised it *sua sponte*. We do not know, because plaintiff has included neither transcript in the record on appeal. Where, as here, the standard of review is *de novo*, the reviewing court may proceed without a record of the trial court's reasons. *Friedl v. Airsource, Inc.*, 323 Ill. App. 3d 1039, 1042 n.2 (2001). However, it is always helpful to know the reasons, if any, given by the trial court, and, in this case, the transcripts might well have explained the "act of God" reference in the written order.

¶ 51                                    C. Counts VI and VII

¶ 52 We turn to counts VI and VII. As discussed, the trial court erred by finding them barred by the Tort Immunity Act. The Village, however, proposes alternative grounds for affirming the dismissal. "It is well settled that a reviewing court is not bound by the reasons given for a trial court's judgment and may affirm on any basis supported by the record regardless of whether the trial court relied on the same basis." *Schultz v. Schultz*, 297 Ill. App. 3d 102, 106 (1998). The Village's contentions on these counts go to the sufficiency of the allegations. See 735 ILCS 5/2-615 (West 2014).

¶ 53 Count VI alleged breach of contract against the Village, with plaintiff as a third-party beneficiary. According to count VI, "the primary purpose of the Easement Agreement was and

now remains to benefit the Plaintiff, the Pond Parcel and the *** Property." The Village contends that plaintiff, who was not a party to the Agreement, was not a third-party beneficiary either, and so has no right to sue under the Agreement. " 'The well-established rule in Illinois is that if a contract is entered into for the direct benefit of a third person, the third person may sue for a breach of the contract in his or her own name, even though the third person is a stranger to the contract and the consideration.' " *Barba v. Village of Bensenville*, 2015 IL App (2d) 140337, ¶ 21 (quoting *Olson v. Etheridge*, 177 Ill. 2d 396, 404 (1997)). In contract interpretation, however, there is a strong presumption that the contracting parties did not intend to confer benefits on noncontracting parties. *Id.* ¶ 22. Illinois law recognizes two types of third-party beneficiaries: intended and incidental. *Hacker v. Shelter Insurance Co.*, 388 Ill. App. 3d 386, 394 (2009). Only an intended third-party beneficiary may enforce rights under a contract. *Bank of America National Ass'n v. Bassman FBT, L.L.C.*, 2012 IL App (2d) 110729, ¶ 27. It is not enough that a third party will reap incidental benefits from the contract; the benefit must instead be intended. *F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*, 372 Ill. App. 3d 89, 96 (2007). Intent to benefit a third party is to be determined from the contract provisions and from the circumstances attending the execution of the contract. *Advanced Concepts Chicago, Inc. v. CDW Corp.*, 405 Ill. App. 3d 289, 293 (2010). So strong is the presumption against third-party-beneficiary status that an intent to benefit a third party must have " 'practically an express declaration.' " *Barba*, 2015 IL App (2d) 140337, ¶ 22 (quoting *F.H. Paschen/S.N. Nielsen, Inc.*, 372 Ill. App. 3d at 96). The plaintiff bears the burden of showing her status as a third-party beneficiary. *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1020 (2009).

¶ 54    Here, having no extrinsic evidence of the circumstances surrounding the execution of the Agreement, we concentrate on the language of the document.    The parties to the Agreement are the Church, the Library, and the Village, all owners of parcels contiguous to, or one lot removed from, the Pond Parcel.    The Agreement recites that the Pond "was designed and constructed to accommodate maximum storm water flows (the 'Pond Capacity') from the Library Parcel, the Village Parcel, the Church Parcel, and the Pond Parcel."    Further, the parties have used the Pond for stormwater detention and their intent is to "permanently protect the establishment, use, and maintenance of [the Pond] for its intended purposes."    The Agreement contemplates future development of the parties' parcels and requires that they maintain a limit of 60% impervious surface coverage.    The Agreement does not mention plaintiff, the Building, or the Property. The Agreement's one mention of nonparties is the following:    "In protecting the function of [the Pond], the Village shall not approve or permit additional or increased storm water discharge into [the Pond] by or for the benefit of any user not a party to this Agreement beyond use which currently exists."    By this provision, the Village is required to limit the stormwater discharge of nonparties.    There is no indication, however, of an intent to benefit anyone but the parties to the Agreement.

¶ 55    Plaintiff contends that, nonetheless, she is a third-party beneficiary of the Agreement:

"Plaintiff pled that [the Building] was adjacent to the Pond Parcel and that the first and perhaps only party to whom the benefit of the promise would be conferred was this [p]laintiff.    Plaintiff's building was the only building next to the Pond when [the Agreement] was signed."

Here plaintiff cites the contiguity of the Property to the Pond Parcel, but it is not enough under the law that plaintiff would reap an incidental benefit from the Agreement.    Indeed, the very

contiguity of the Property to the Pond Parcel supports the inference that the failure to mention the Property was deliberate. At the very least, plaintiff, who has the burden on this issue, has not established that the inference is unreasonable. Consequently, since the Agreement contains nothing that is " 'practically an express declaration' " (*Barba*, 2015 IL App (2d) 140337, ¶ 22 (quoting *F.H. Paschen/S.N. Nielsen, Inc.*, 372 Ill. App. 3d at 96)) of an intent to confer a benefit on plaintiff, we hold that she has failed to plead her status as a third-party beneficiary. Therefore, the dismissal of count VI was not in error. We note that, though the trial court dismissed the count with prejudice, the court neither ruled on nor considered whether the complaint stated a cause of action—or whether, assuming that legal insufficiency was found, the dismissal should be with or without prejudice. The decision to deny leave to amend is within the sound discretion of the trial court, and generally the trial court should give a plaintiff at least some opportunity to cure the defects in his or her complaint. *In re Application of the County Collector of Lake County*, 343 Ill. App. 3d 363, 370 (2003). Thus, we affirm the dismissal of count VI, but we vacate the court's determination that the dismissal is with prejudice.

¶ 56 As for count VII, the Village contends that it does not state a cause of action for *mandamus*. "*Mandamus* is an extraordinary remedy to enforce the performance of official duties by a public officer where no exercise of discretion on his part is involved." *Wilson v. Quinn*, 2013 IL App (5th) 120337, ¶ 18. "For a complaint seeking *mandamus* to withstand a challenge to its legal sufficiency, it must allege facts which establish a clear right to the relief requested, a clear duty of the respondent to act, and clear authority in the respondent to comply with the writ." *Id.* Further, there must be no other adequate remedy. *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 18; *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 465 (2004).

¶ 57    First, we note that plaintiff has another adequate remedy.   We have already held that plaintiff's counts sounding in tort are not barred by the Tort Immunity Act; thus, as plaintiff's trespass counts are viable, *mandamus* will not lie.

¶ 58    We also note that plaintiff's *mandamus* count fails for other reasons.    Plaintiff's prayer for relief in that count asks that the Village be ordered to perform the following acts:

> "A. To redesign and construct the Village Parcel so that it has no more than a 60% impervious surface coverage, and/or;
>
> B. Modify the Pond to lower the BFE, and/or;
>
> C. To report to the Lake County Stormwater Management Commission that it has developed the Village Parcel and the Pond Parcel in violation of [the Watershed Ordinance], and/or;
>
> D. To build appropriate levy and berms to protect [the Property], and/or;
>
> E. To redesign and reconstruct the Pond Parcel and [the] Pond so that the Pond, its design, construction, and maintenance complies with the mandates of [the Watershed Ordinance]."

¶ 59    Other than the relief requested in subparagraph C, all of the requested relief involves the exercise of discretion.   Redesigning, constructing, modifying, building, and reconstructing are actions that require vast numbers of decisions to be made by large numbers of individuals exercising their judgment and discretion and are not the types of actions susceptible to an order of *mandamus*.

¶ 60    Further, the Village's actions regarding the reconstruction and maintenance of the Pond were not the performance of official duties by a public officer.   The Pond Parcel is owned by the Church; the Village rehabilitated and maintained the Pond, not in its official capacity as a

municipal corporation, but because of its status as a party to the Agreement. This activity did not arise from a duty the Village owed to the general public; it is more akin to the actions of a neighbor " 'who so piles sand close to his boundary that by force of gravity alone it slides down onto his neighbor's land, or who so builds an embankment that during ordinary rainfalls the dirt from it is washed upon adjacent lands,' " or who " 'erects a dam across a stream, thereby intentionally causing the water to back up and flood' " another's land. *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 555 (1980) (quoting Restatement (Second) of Torts, § 158 cmt. I & illus. 5 (1965)). Thus, the Village could not be compelled to perform official duties in regard to the Pond, because it had only private, not official, duties to perform. For all these reasons, count VII was properly dismissed. Moreover, because we have determined that other relief is available, we additionally determine that the dismissal *with prejudice* was proper.

¶ 61                                III. CONCLUSION

¶ 62    For the foregoing reasons, we affirm the trial court's dismissal with prejudice of count VII. We affirm the dismissal of count VI, but we vacate the finding of prejudice attached to the dismissal. We reverse the trial court's dismissal of counts I, II, and III, and we remand the cause for further proceedings.

¶ 63    Affirmed in part and reversed in part.

¶ 64    Cause remanded.